Thomas R. WASKOVICH, Plaintiff,

v.

General Vito MORGANO,
et al., Defendants.

Civ. No. 91–1327(CSF).

United States District Court,
D. New Jersey.

Aug. 27, 1992.

Groen, Laveson, Goldberg & Rubenstone by Murray S. Issadore, Marlton, N.J., for plaintiff.

Robert J. Del Tufo, Atty. Gen. by Glenn R. Jones, Deputy Atty. Gen., Trenton, N.J., for defendants.

## OPINION

CLARKSON S. FISHER, District Judge.

### I. *Introduction*

On June 2, 1992, the court ordered an evidentiary hearing to facilitate the determination of a single issue. A resolution of the issue in favor of the defendants will terminate the case, while a resolution of the issue in favor of the plaintiff will render the case trial ready. The question presented can be stated simply: whether the position of Director of Veterans' Administrative Services, a position within the New Jersey Department of Military and Veterans' Affairs (DMVA), is a "confidential," "policy-making" position, thereby subjecting the person in the position to dismissal based on his affiliation with a political party. The issue can be framed another way: whether the position of Director is a nonconfidential, nonpolicy-making position, thereby subjecting the State to liability based on the First Amendment's prohibition against the political termination of such employees.[1] For the reasons set forth below, the court has determined that, because the Director is a confidential, policy-making employee and because party affiliation is an appropriate requirement for the job, plaintiff could be terminated based on his political affiliation. Accordingly, the defendants' motion for summary judgment is granted, and plaintiff's motion for reconsideration of the court's June 2, 1992, order is denied as moot.

### II. *Background*

As the court noted in its previous opinion, plaintiff, Thomas R. Waskovich (Waskovich), the former Director of the Division of Veterans' Administrative Services, brought this action under 42 U.S.C. §§ 1983, 1985 and 1986, the First, Fifth and Fourteenth Amendments to the United States Constitution and Articles I and VII of the New Jersey Constitution. Essentially, plaintiff claims that he was discharged, in violation of the First Amendment's protection against political firing, from the position of Director by the recently-elected Democratic Administration because of his affiliation with the Republican Party.

Waskovich was appointed to the position of Director of the Division in May of 1988. The Division operates within the DMVA, a cabinet-level department of the Executive

---

1. In its July 2, 1992, opinion, the court noted that all parties have urged the court to resolve this issue. The court recognizes that there exists a factual dispute concerning the role and function of the Director of Veterans' Administrative Services. Nevertheless, because a question of law, concerning the issue of whether plaintiff falls within the ambit of the First Amendment protection against political firing, necessitates the resolution of the factual dispute, the court will decide the factual issue. In doing so, the court must respectfully disagree with *Peters v. Delaware River Port Auth.*, 785 F.Supp. 517, 522 (E.D.Pa.1992). When presented with a similar issue, the *Peters* court denied a motion for summary judgment because there existed a genuine issue of material fact concerning plaintiff's duties in the position from which he was discharged. It should be noted that this matter is different from *Peters* because the court should resolve the issue presented here by confining its analysis to the statute creating the position of director. The court conducted the evidentiary hearing to illuminate the contours of the function of director in light of the statutory scheme. Here, the issue presented is, in essence, a question of law. Additionally, in all the other cases reviewed by the court it appears that the district court decided the issue as a matter of law.

Branch of the state government. In the role of Director, Waskovich was charged with the duties of, *inter alia*, supervising and operating the New Jersey Veterans Memorial Home—Menlo Park, the New Jersey Veterans Memorial Home—Vineland, the New Jersey Veterans Memorial Home—Paramus and the New Jersey Veterans Memorial Cemetery—Arneytown. *See* N.J.S.A. § 38A:3–2(b) (West Supp. 1991). On July 13, 1990, Waskovich was told that he was being dismissed as the Division Director. Waskovich charges that this action was taken by the recently-elected Democratic Administration because of his affiliation with the Republican Party. Accordingly, in May of 1991, Waskovich filed this action against defendants, the State of New Jersey; the DMVA; the Adjutant General, Major General Vito Morgano; the Deputy Adjutant General, Preston M. Taylor; the Deputy Commissioner, Richard Bernard; and the Governor of the State of New Jersey, James J. Florio.

By order dated June 2, 1992, the court dismissed plaintiff's claims against defendants the State of New Jersey and the DMVA based on the Eleventh Amendment's sovereign immunity doctrine. Additionally, the court dismissed plaintiff's claims for monetary damages against the individual defendants in their individual capacity based on the doctrine of qualified immunity. Hence, the court noted that there was only one issue remaining: plaintiff's claim for reinstatement brought against the individual defendants in their official capacities. Resolution of this issue, the court noted, depends on the determina-

tion of plaintiff's First Amendment claim. As the court has explained, defendants maintain that Waskovich was discharged because his philosophies did not comport with those of the new administration and because they felt that a change in the position was necessary.[2]

Further, the court recognized that, for purposes of this motion for summary judgment, defendants argue that the Director's position is a confidential, policy-making position subject to termination based on an individual's membership in a political party. Accordingly, the court set forth the applicable standard to be utilized in determining the issue. Finding that the defendants did not carry their burden of demonstrating that the position of Director was a confidential, policy-making position subject to political termination, the court ordered an evidentiary hearing. The court instructed the parties to present evidence concerning the duties and responsibilities of the Director.

A hearing was commenced on July 1, 1992, and was completed on August 3, 1992. Having listened to the testimony and having reviewed the documentary evidence, it is clear that plaintiff was a confidential, policy-making employee, and that political affiliation is an appropriate requirement for the position of Director of Veterans' Administrative Services. This decision is supported by numerous factors.

### III. *Legal Standard*

Before detailing the facts that buttress this determination, it is necessary to set forth the underlying legal framework. The United States Supreme Court has held

---

**2.** In its June 2, 1992, opinion, the court stated:

The defendants assert that Waskovich was an at-will employee terminable for any reason. Defendants persuasively support this position by referring the court to the language of the statute creating the position of Director. N.J.S.A. § 38A:3–2(c) (West Supp.1991). The Statute states, in relevant part, that "[t]he Director shall be appointed by the Adjutant General with the approval of the Governor, and *shall serve at the pleasure of the Adjutant General*." *Id.* Emphasis added.

It is clear to the court that the necessary consequences of the legislature's choice of the words "at the pleasure of the Adjutant General" renders the position of Director an at-will

employee. The Third Circuit has instructed that, when interpreting a statute, the court is to "give effect, if possible, to every clause and word of a statute." *Bell v. United States,* 754 F.2d 490, 497 (3d Cir.1985). If the court were to accept plaintiff's argument that he was subject to termination only for good cause, then the clause "at the pleasure of the Adjutant General" would be rendered meaningless. Accordingly, because Waskovich was an at-will employee, he could be terminated for any constitutionally permissible reason. *See Zold,* 935 F.2d at 639 ("There is no basis to assume that an employee hired at will, who can be fired for any or no reason, can be fired for a constitutionally prohibited reason.").

that "the dismissal of certain public employees solely because of their partisan political affiliation infringes their First Amendment rights of belief and association." *Zold v. Mantua*, 935 F.2d 633, 635 (3d Cir.1991) (citing *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); and *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)). Thus, certain employees are excepted from, and do not fall within, the class of protected individuals. This exception was created because "there are situations which arise where an employer has a legitimate interest in employing persons who will loyally implement the policies of a political party and guard confidential information from improper disclosures." *Peters*, 785 F.Supp. at 521 (citing *Elrod*, 427 U.S. at 365–68, 96 S.Ct. at 2685–87; *Branti*, 445 U.S. at 518, 100 S.Ct. at 1294; and *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)). An expansive discussion of the purposes of this exception to the general First Amendment protection is contained in *Hall v. Ford*, 856 F.2d 255, 262–63 (D.C.Cir.1988). The *Hall* court expounded on the rationale for the rule:

> High level officials must be permitted to accomplish their organizational objectives through key deputies who are loyal, cooperative, willing to carry out their superiors' policies, and perceived by the public as sharing their superiors' aims; this is true whether or not those officials are elected. In the case of key patronage appointments, this government interest is protected because of the presumption that these individuals are compatible with the elected officials they serve. As they belong to the same party, they must be presumed to share common interests and goals, which cannot be said of members of an opposition party. But regardless of whether a key policy level deputy is appointed from among the ranks of party members, the need for compatibility remains.

*Id.* at 263. Hence, this rationale implicates one issue: "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."

*Branti*, 445 U.S. at 518, 100 S.Ct. at 1294. The Third Circuit has stated that the nature of this inquiry is extremely fact specific. *Zold*, 935 F.2d at 635. Accordingly, the circuit court, while not developing any talismanic test, has listed a number of factors that the court may look to in making this determination. *See Brown v. Trench*, 787 F.2d 167, 169 (3d Cir.1986). Such factors include: whether the employee's duties are simply clerical or related to law enforcement, nondiscretionary or technical; whether the employee is involved in counsel discussions or other meetings, or whether the employee prepares budgets or has the authority to hire and fire other employees. Moreover, the court may look at the employee's salary, the employee's ability to control other employees and his ability to speak in the name of policy makers. *Id.* at 169 (citations omitted). Further, the court pointed out that the key factor is not whether the employee had a great deal of responsibility, but whether the employee has "meaningful input into decision making concerning the nature and scope of a major ... program." *Id.* (quoting *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981)).

After applying the facts of this case to some of these factors, the *Brown* court held that a county assistant director of public information who had significant duties as a liaison to the community could be discharged based on political affiliation. Similarly, after applying the facts of this case to some of the factors enumerated by the circuit court, it is readily apparent that Waskovich falls within the class of employees not protected by the First Amendment.

IV. *The Role of the Director*

It is imperative to point out that, for the purposes of this summary judgment motion, it must be assumed that Waskovich was dismissed because of his affiliation with the Republican Party. Additionally, it is important to note that in examining the issue, whether the defendants have demonstrated that party affiliation is an appropriate requirement for the position of Director of Veterans' Administration Services, the court will not look at the function of Was-

kovich in the position but, instead, will analyze the function of the position itself. *See Brown*, 787 F.2d at 168 (citing *Mummau v. Ranck*, 531 F.Supp. 402, 404 (E.D.Pa.), *aff'd*, 687 F.2d 9 (3d Cir.1982) (per curiam) ("The relevant inquiry focuses on the function of the public office involved ... not the function of the particular employee occupying the office.")).

Plaintiff does not dispute that the Director performs more than clerical activities; instead, plaintiff argues that political affiliation is not an appropriate requirement for the job. To bolster this position, plaintiff points to the testimony of the defendants' witnesses, wherein they uniformly and unequivocally stated that political affiliation was not a necessary qualification for the position. At first glance, this testimony should end the court's inquiry and compel the court to hold in the plaintiff's favor. Looking deeper, however, the court is compelled to reach the opposite conclusion. This is true because the issue is not whether the Director's superiors ever considered party affiliation in filling the position; rather, the issue is whether they could have. The answer is yes.

### A. Organizational Hierarchy

An examination of the organizational hierarchy within the DMVA will assist in elucidating the function of director. At the top of the chart is, of course, the Governor. Next is the Adjutant General, who is a cabinet-level official in the state government and is appointed by the Governor with the advice and consent of the Senate. N.J.S.A. § 38A:3–3. The Deputy Adjutant General is next in line and is also appointed by the Governor. N.J.S.A. § 38A:3–5. Just below the Deputy Adjutant General is the Deputy Commissioner of Veterans' Affairs. N.J.S.A. § 38A:3–4.1. The Deputy Commissioner is appointed by the Governor with the advice and consent of the Senate. The statute defines the Deputy Commissioner's role as follows:

> The Administrator shall, under the supervision of the Adjutant General, direct and oversee the activities of the Director of the Division of Veterans' Administrative Services, the Director of the Division of Veterans' Loans, Grants and Services, and the Director of the Division of Veterans' Training, Information and Referral.

*Id.*

The three director positions referenced in the statute are just below the Deputy Commissioner on the organizational chart, and their duties are defined by statute. *See* N.J.S.A. § 38A:3–2(c) (Veterans' Administrative Services); § 38A:3–2(e) (Veterans' Loans, Grants and Services); § 38A:3–2(g) (Veterans' Training, Information and Referrals). The statute relevant to this motion provides:

> The Division of Veterans' Administrative Services shall be under the immediate supervision of a Director, who shall be an honorably discharged veteran qualified by training and experience to direct the work of the Division. The Director shall be appointed by the Adjutant General, with the approval of the Governor, and shall serve at the pleasure of the Adjutant General.

N.J.S.A. § 38A:3–2(c). It should be noted that there are no positions below that of Director enumerated in the statutory scheme.

By statute, the Director of Veterans' Administrative Services is charged with the duties of supervising and operating the three New Jersey veterans' homes and the New Jersey veterans' cemetery. N.J.S.A. § 38A:3–2(b). Accordingly, below the director on the organizational chart are the chief executive officers of the cemetery and the nursing homes.

Having examined this statutory construct, the court is convinced that the legislature has manifested an intent to provide the Governor with high-level officials in the department that are both philosophically and politically in the Governor's camp.

### B. The Statutory Scheme

"Although state law is not necessarily dispositive of the inquiry whether an employee is a confidant, policy maker or other employee for whom political affiliation is appropriate under *Elrod*, it is an important and influential factor." *Zold*, 935 F.2d at

640. Incorporating this factor into the analysis here tips the scales heavily in favor of granting defendants' motion. By statute, the New Jersey legislature has politicized the office of Director. *See* N.J.S.A. § 38A:3–2(c). In relevant part, the statute provides: "The Director shall be appointed by the Adjutant General with the approval of the Governor, and shall serve at the pleasure of the Adjutant General." *Id.* The plain language of the statute indicates that the position of Director has been deemed political in nature. Indeed, the only other positions that the statute specifically creates are the ones listed previously. While there has been no testimony concerning the duties of these other positions, it certainly can be argued that, because the legislature has specifically created these roles and defined their duties, the legislature has expressed an intent to permit the administration to have all of its policy makers "on board."

This reasoning is bolstered by the testimony elicited on numerous occasions throughout the hearing, which indicated that in the period following the Governor's election there was a turnover in all of the Directors' positions.

The question in this case is where to draw the line. Plaintiff asks the court to draw the line just above him, thereby cloaking him in the First Amendment protection against political discharge. Yet the facts of this case require the court to draw the line below the plaintiff and hold that his was a "confidential," "policy-making" position, subjecting him to discharge based upon his party affiliation, or, said another way, party affiliation is an appropriate requirement for the effective performance of the job. This conclusion is bolstered by the testimony and the documentary evidence.

### C. General Duties

The role and function of the Director may be defined from a number of sources. Defendants' Exhibit 7 provides a concise definition and description of the job. It should be noted that the items listed in the document are supported by ample testimony in the record. The document provides:

DIRECTOR, DIVISION OF VETERANS' ADMINISTRATIVE SERVICES

DEFINITION: Under the immediate supervision of the Administrator of Veterans' Affairs, the Director of Administrative Services will supervise the operation, administration, and functions of the Veterans' Homes at Menlo Park, Vineland, and Paramus and the operation, administration, and functions of the N.J. Veterans' Cemetery at Arneytown.

EXAMPLES OF WORK:

Directly responsible for all administrative and operational functions associated with the functional operation of Veterans' Homes at Menlo Park, Vineland, Paramus and the Veterans' Cemetery at Arneytown.

Directly coordinates the day-to-day activities of all subordinate personnel associated with the functional operation of Veterans' Homes at Menlo Park, Vineland, Paramus and Veterans' Cemetery at Arneytown.

Formulates and implements rules and regulations which will affect the administrative policies of the Department of Veterans' Affairs and Defense.

Directs the implementation of budget preparation and fiscal and programmatic control systems; conducts research and analysis of problems as they arise at the Veterans' Homes and Arneytown Cemetery.

Represents the Department at meetings and conferences with State and Federal officials to discuss and clarify requirements and other issues.

Directs the internal auditing program to ensure that appropriate fiscal and programmatic controls are enforced at all locations.

Directs the establishment and maintenance of essential records and files.

Supervises the work operations and/or functional programs and has responsibility for effectively recommending the hiring, firing, promoting, demoting, and/or disciplining of employees.

Defendants' Exhibit 7.

The current director, Joseph Loudermilk, testified that he performs the functions

listed. In addition, the plaintiff's resumé reflects the ample powers assigned to the Director. Describing the position, Waskovich's resumé provides:

> Responsible for supervision, management, and planning in Veterans' Affairs, including creating, developing, and implementing new programs. The Veterans' Section of the Department consists of eighteen veterans' service offices, three nursing homes, a cemetery, and various grant programs with a total budget of approximately $25 million. Interface with other state and government agencies, veterans' organizations, and the public on veterans' issues.

Defendants' Exhibit 1.

Having listed a broad and general overview of the responsibilities of the Director, the court will turn to the specific facts that support the conclusion that political affiliation is an appropriate requirement for the job.

### D. Specific Factors

First, the statute requires that the Governor approve the Adjutant General's selection of the Director. Second, the Director is a highly paid employee receiving over $64,000.00 a year. Third, the Director meets with veterans' groups on behalf of the Department.

Loudermilk testified that before going to a function he meets with Morgano and Taylor to agree on his "task" for the meeting. Loudermilk explained that his task at many of the meetings with veterans' groups is to convey a uniform departmental message to the constituency it serves. Saliently, Loudermilk pointed out that the Director must be "in harmony" with his superiors. The harmony of an individual's views with those of his immediate superiors, who are the immediate subordinates of the Governor, is exactly what is contemplated by the *Branti* test. Plaintiff asserts that defendants' arguments, which go to philosophical disagreement over policy, are irrelevant. I disagree. As explained in *Hall*, "High level officials must be permitted to accomplish their organizational objectives through key deputies who are loy-

al, cooperative, willing to carry out their superiors' policies and perceived by the public as sharing their superiors' aims...." *Hall*, 856 F.2d at 266.

It should be pointed out that the court is not influenced by the evidence concerning Waskovich's disagreement with policy; rather, the court is simply finding that the person occupying the position of Director must have the same philosophy as his superiors. This is true because the Director serves as the liaison between the department and the citizens of New Jersey.

Fourth, there is ample evidence that the Director periodically conducts a meeting with his "staff." The staff includes: the Deputy Director, the three nursing home CEO's, the cemetery CEO and the medical directors from the nursing homes. *See* Defendants' Exhibit 22. Also, it is apparent that the Director attends a monthly staff meeting. At that meeting, the Director is given the opportunity to report on his division and give input on important policy matters affecting the department. The Director's contribution to formulation of department policy will be discussed below.

Fifth, the testimony indicates that the Director is charged with overseeing the largest division within the department and that the division employs over one thousand people. Plaintiff contends, and Loudermilk testified on cross-examination, that the Director cannot himself fire the CEO's. Nevertheless, it is apparent from the testimony of Morgano, Taylor and Bernard that, because of their substantial responsibilities overseeing all of the department, great weight must be put on the recommendations of the Directors. Additionally, the job description previously given notes that the Director has the responsibility for "effectively recommending the hiring, firing, promoting, demoting, and/or disciplining of employees."

The inquiry does not stop here. As *Brown* instructed, the key inquiry is "not whether the employee had a great deal of responsibility, but whether the employee has 'meaningful input into decision making concerning the nature and scope of a major ... program.'" *Brown*, 787 F.2d at 169–

70. Once again, it should be noted that it is not whether Waskovich had meaningful input; rather, focus is on whether the person occupying the position of Director has meaningful input. Because the Director necessarily has input into major policy decisions concerning the operation of the nursing homes, the question is answered in the affirmative.

### E. Director as Policy Maker

Initially, I recognize that the word "policy" was used quite extensively during the hearing. As plaintiff's counsel pointed out, simply stating the word does not inform the court as to the duties of the director. Reference to a few examples of decision making, however, will provide a workable definition of the word as well as support the court's conclusion that the Director is a policy maker.

Although the Director neither has the power to fire a CEO of a nursing home unilaterally nor to close a wing of a home, he can recommend to the Deputy Commissioner that such actions be taken. Similarly, the Director is not permitted to single-handedly increase or decrease the number of beds available to veterans at the facilities, but it is undisputed that the Director can and does recommend that such action be taken. For example, when a reduction in the number of beds at the Menlo Park facility was suggested by Colonel Bruce Eveland, the Assistant Commissioner for Veterans' Affairs, Waskovich disagreed and recommended that the issue be discussed at a staff meeting. *See* Defendants' Exhibit 14.

It is apparent that the Director is always permitted to comment on proposed policy. *See, e.g.*, Defendants' Exhibit 14 (Menlo Park bed reduction); Defendants' Exhibit 8 (Director's memorandum to Deputy Adjutant General concerning proposed implementation of uniform personnel practices) ("I do not recommend this policy."); Defendants' Exhibit 13 (criticizing reduction in F.T.D.). It is also apparent that the Director will be called upon to formulate the strategy for implementation of the approved policy proposals. Loudermilk testi-

fied that as one of his initial tasks he was charged with the obligation of creating uniform procedures and practices to be implemented at the three nursing homes. There is ample testimony in the record that indicates that, prior to this time, each of the nursing homes had been operating autonomously under its own set of rules. It cannot be argued that the creation and implementation of uniform practices and procedures throughout the nursing homes does not constitute major policy input.

Finally, it should be noted that generally the superiors of the Director will not possess a background in nursing home operation. The Adjutant General and Deputy Adjutant General essentially have their expertise in military affairs. The Deputy Commissioner has to oversee three large areas of operation. Thus, the Director's position is an integral part of policy formulation within the DMVA. The court does not believe it is extending the arm of party affiliation too far by drawing the line at the position of Director.

Accordingly, it is the court's opinion that, based on the facts of this case, political affiliation is an appropriate requirement for the position of Director. Therefore, the defendants' motion for summary judgment is granted, and the plaintiff's complaint is dismissed with prejudice.

### V. *Motion for Reconsideration*

Also before the court is plaintiff's motion for reconsideration of the court's June 2, 1992, order. Essentially, plaintiff argues that, because the court had not ruled on whether political affiliation was an appropriate requirement for the position of Director, it could not rule that the defendants were immunized from monetary liability. Because the court has ruled that the person occupying the position of Director is subject to dismissal for political reasons, the plaintiff's motion for reconsideration is moot and, therefore, is denied.