2 F.3d 1292
 Thomas R. WASKOVICH, Appellant,
v.
Vito MORGANO, Major General; Preston M. Taylor, Brigadier
General; Richard Bernard, Deputy Commissioner; the
Honorable James J. Florio; New Jersey Department of
Military & Veterans' Affairs; State of New Jersey; Certain
Unknown Defendants.
 No. 92-5525.
 United States Court of Appeals,
Third Circuit.
 Argued May 6, 1993.
Decided Aug. 16, 1993.
 
 William Goldstein (argued), Groen, Laveson, Goldberg & Rubenstone, Bensalem, PA, for appellant.
 Robert J. Del Tufo, Atty. Gen. of New Jersey (Mary C. Jacobson, Sr. Deputy Atty. Gen., of counsel) and Glenn R. Jones (argued), Office of Atty. Gen. of New Jersey, Trenton, NJ, for appellees.
 Before: SLOVITER, Chief Judge, COWEN and LEWIS, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Chief Judge.
 
 
 1
 Before us is the appeal of plaintiff Thomas R. Waskovich, who alleges that he was fired from his position as Director of Veterans' Administrative Services for the State of New Jersey on the basis of his political party affiliation. The district court granted summary judgment for the defendants, concluding that Waskovich occupied a confidential, policymaking position from which he could be dismissed on that basis. See Waskovich v. Morgano, 800 F.Supp. 1220 (D.N.J.1992). Waskovich contends that the evidence produced at a hearing held by the district court to illuminate the functions performed by the Director precludes the entry of summary judgment against him.I.
 
 Facts and Procedural History
 
 2
 Waskovich, a former Republican Mayor of Lacey Township, New Jersey, was appointed in May 1988 to the newly created position of Director of the Division of Veterans' Administrative Services. The Division is one of three branches within the New Jersey Department of Military and Veterans' Affairs (DMVA or Department), a department within the executive branch of state government. See N.J.Stat. Ann. Sec. 38A:3-1 (West Supp.1993). Waskovich was the first person appointed as Director after the New Jersey legislature transferred responsibility for veterans' issues from the Department of Human Services, where Waskovich had served for a short period, to the DMVA.
 
 
 3
 Shortly after James Florio, a Democrat, was sworn in as Governor of New Jersey, the Adjutant General, his Deputy, and the Administrator of Veterans' Affairs, who were Waskovich's superiors at the DMVA, were replaced. App. at 129-30.[1] Waskovich continued to serve in his position as Director until July 1990, when he was informed by the new Adjutant General that he was being replaced by Joseph Loudermilk, who was then serving as the Chief Executive Officer of the New Jersey Veterans' Memorial Home in Paramus.
 
 
 4
 On April 1, 1991, Waskovich filed suit in federal court against Major General Vito Morgano (the current Adjutant General of DMVA), Brigadier General Preston Taylor (the Deputy Adjutant General), Richard Bernard (the Administrator of Veterans' Affairs), Governor Florio, the DMVA, and the State of New Jersey. Waskovich alleged that his dismissal violated the First Amendment's prohibition against politically motivated discharges, and sought reinstatement and damages.
 
 
 5
 After discovery, the defendants moved for summary judgment. The district court granted the motion on Eleventh Amendment grounds with respect to Waskovich's claim for monetary damages against the State, the DMVA, and the individual defendants in their official capacities.[2] The district court also concluded that claims against the individual defendants in their personal capacities were barred by the doctrine of qualified immunity.
 
 
 6
 With respect to defendants' motion for summary judgment on Waskovich's claim for reinstatement, the court stated that there were insufficient facts for it to determine whether political affiliation is a legitimate factor to be considered for the position of Director. Specifically, the court noted that the parties had not submitted affidavits and had filed only "snippets of deposition testimony." App. at 332. In light of the sparse factual record before it, the court concluded that it was unable "to determine precisely what functions Waskovich performed as Director." Id. Accordingly, it ordered a hearing "so that testimony concerning the duties of the director can be heard." App. at 333. It stated further, "After such information has been presented, the court will be able to decide the defendants' motion for summary judgment." Id.
 
 
 7
 At the hearing, Taylor, Bernard, Morgano, and Loudermilk testified on behalf of the defendants. Waskovich testified on his own behalf. In addition, the parties introduced documents from the two-year period when Waskovich served as Director, including letters and memos written by Waskovich, memos sent to him, and minutes of meetings he attended. Shortly after the hearing, the district court granted defendants' motion for summary judgment. The court assumed for the purposes of the motion that the defendants had discharged Waskovich on the basis of his party affiliation, see Waskovich, 800 F.Supp. at 1223, and thus focused solely on the statutory scheme and the duties and policymaking functions of the Director. Based on this analysis, the court concluded that Waskovich's dismissal did not violate the First Amendment because "political affiliation is an appropriate requirement for the position of Director." Id. at 1227.[3]
 
 
 8
 Waskovich filed a timely notice of appeal. We have jurisdiction under 28 U.S.C. Sec. 1291 (1988), and exercise plenary review over the district court's grant of summary judgment. See Public Interest Research Group v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 76 (3d Cir.1990), cert. denied, 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991).
 
 II.
 
 9
 Summary Judgment Procedure Followed in the District Court
 
 
 10
 We comment initially on the procedure followed by the district court in holding an evidentiary hearing before granting the motion for summary judgment. In Smith v. City of Pittsburgh, 764 F.2d 188 (3d Cir.), cert. denied, 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985), the district court granted defendant's motion for summary judgment on plaintiff's procedural due process claim after holding "a lengthy evidentiary hearing which appears to have been designed to resolve the crucial factual dispute, whether [plaintiff] was discharged before or after he was given a hearing by [defendant]." Id. at 190. The court concluded that the defendant's position was "contrary to 'the overwhelming weight of the evidence.' " Id. at 191 (quoting district court opinion). On appeal, because we held that plaintiff's claim was barred on other grounds we did not address the merits of the due process issue and the finding made by the district court on the evidence. Nevertheless, we noted that Fed.R.Civ.P. 56(c)[4] is explicit as to the materials that can form a basis for summary judgment, and does not mention an evidentiary hearing. We stated:
 
 
 11
 There is no reference to any evidentiary hearing, for obvious reasons. If there is a dispute as to a fact that can only be determined after a hearing, then the issue may not be resolved by summary judgment. The procedure followed in this case by which the court directed a hearing and made factual determinations on which the summary judgment was predicated was unauthorized and improper.
 
 
 12
 Id. at 192.
 
 
 13
 The issue arose again in Hancock Industries v. Schaeffer, 811 F.2d 225 (3d Cir.1987), a suit by private haulers of Philadelphia solid waste challenging on constitutional and statutory grounds the closing of two Pennsylvania county landfills to waste originating outside the counties. Plaintiffs moved for a preliminary injunction and several defendants filed motions to dismiss or in the alternative for summary judgment. The district court scheduled a preliminary injunction hearing and informed the parties that all pending motions might be considered at that time. At the hearing, the court "permitted various defense witnesses to testify and be cross-examined, admitted stipulated facts into evidence, and accepted the parties' proffers as to what their witnesses would say if they testified." Id. at 228.
 
 
 14
 On appeal, we affirmed the district court's grant of summary judgment for the defendants. In reviewing a challenge to the procedure adopted by the court, we noted that the district court properly had relied on the factual information presented as the record basis for deciding the preliminary injunction motion. Id. at 230. With respect to the summary judgment motions, we explained that the court appropriately "utilized the testimony at the ... hearing to determine what facts were not in dispute." Id. After noting that several courts of appeals had held that "the use of oral testimony on a summary judgment motion is specifically authorized by Fed.R.Civ.P. 43(e)," id. at 230 n. 2, we stated:
 
 
 15
 Testimony given in an evidentiary hearing is no different from testimony given in a deposition and may be treated the same in summary judgment proceedings. As with deposition testimony and affidavits, if there is no contradictory evidence, facts testified to in a hearing may be accepted as true for summary judgment purposes without an assessment of the credibility of the witnesses.
 
 
 16
 Id. at 230-31 (citation omitted); see also 6 James W. Moore et al., Moore's Federal Practice p 56.11, at 56-154 (1993). Finally, we concluded that the district court could properly have "looked to the testimony of the defendants' witnesses for an articulation of the public purpose which the decisions limiting access to the landfills were intended to serve." Hancock, 811 F.2d at 231.
 
 
 17
 Taken together, Smith and Hancock lead us to conclude that in certain circumstances a district court may hold an evidentiary hearing at which it receives oral testimony, documents, and other evidence relating to a pending summary judgment motion, but it may not rely on the material submitted at such a hearing as a means of resolving any genuine issues of material fact. Nor, of course, may it weigh the evidence submitted, judge the credibility of the witnesses who testified, or use the information it receives as a basis for making findings of fact, as all of these activities are incompatible with summary disposition of the case. It follows that this procedure should rarely be pursued lest the hearing be turned into a mini-trial entailing a significant waste of judicial resources. See 6 Moore's Federal Practice p 56.11, at 56-155.
 
 
 18
 In this case, the district court held the hearing solely to determine whether any material issues of fact existed with respect to the Director's functions in light of the statutory scheme. The court stated it was treating the issue presented as a question of law. In its detailed opinion analyzing the evidence submitted by both parties at the hearing, the district court relied on the statute itself, on undisputed documents, and on unrefuted statements made by the testifying witnesses.[5] Although we view the procedure with concern, we cannot hold it was error here, particularly inasmuch as neither party objected in the district court to the procedure followed nor raised this issue on appeal.
 
 
 19
 Of course, because our review of the district court's grant of summary judgment is plenary, we must take all of the facts and inferences in the light most favorable to the nonmoving party and must make our own independent determination of whether there exists a genuine issue of material fact precluding summary judgment. See Erie Telecommunications, Inc. v. City of Erie, 853 F.2d 1084, 1093 (3d Cir.1988). If there is no material factual dispute as to whether political affiliation is a permissible job requirement, summary judgment is appropriate. See Ness v. Marshall, 660 F.2d 517, 522-23 (3d Cir.1981) ("Where, as a matter of law, a person is determined to have occupied a policymaking position, that person's claims to protection from patronage dismissal ... are disposable on a motion for summary judgment."); see also Mummau v. Ranck, 687 F.2d 9, 10 (3d Cir.1982) (per curiam) (affirming grant of summary judgment after concluding as a matter of law that assistant district attorney may be dismissed on the basis of his political affiliation).
 
 III.
 Applicable Legal Principles
 
 20
 The Supreme Court has made it plain that "the First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved." Rutan v. Republican Party of Illinois, 497 U.S. 62, 64, 110 S.Ct. 2729, 2732, 111 L.Ed.2d 52 (1990); see Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). We too have stated that although a "nonpolicymaking, nonconfidential government employee cannot be discharged on the sole ground of his or her political beliefs," s/he can be dismissed on that ground if s/he "acts as an advisor or formulates plans for the implementation of broad goals." Zold v. Township of Mantua, 935 F.2d 633, 635 (3d Cir.1991) (quotations omitted). However, " 'the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.' " Id. (quoting Branti, 445 U.S. at 518, 100 S.Ct. at 1295). As we explained in Zold, " 'should a difference in party affiliation be highly likely to cause an official to be ineffective in carrying out the duties and responsibilities of the office, dismissals for that reason would not offend the First Amendment.' " Id. (quoting Ness, 660 F.2d at 521); see also Burns v. County of Cambria, 971 F.2d 1015, 1023 (3d Cir.1992) (noting that exception for political dismissals is "narrow"), cert. denied, --- U.S. ----, 113 S.Ct. 1049, 122 L.Ed.2d 357 (1993).
 
 
 21
 The troublesome questions arise at the margins. Courts have candidly acknowledged that "between the strictly menial government worker ... and the policymaker/confidential assistant ... there is a range of government positions for which the propriety of patronage firing has depended largely on the courts' juggling of competing constitutional and political values." Upton v. Thompson, 930 F.2d 1209, 1213 (7th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992); see also Zold, 935 F.2d at 635 ("It is not always easy to determine whether political affiliation is a legitimate factor to be considered for a particular job."). This difficulty "is the natural result of the myriad of governmental bodies, departments, and positions, and the varying responsibilities of public employees." Pounds v. Griepenstroh, 970 F.2d 338, 341 (7th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1256, 122 L.Ed.2d 654 (1993).
 
 
 22
 Thus, we have held that Branti-Elrod protection extends to deputy sheriffs, Burns, 971 F.2d at 1023; deputy township clerks, Zold, 935 F.2d at 636-40; and a county's second deputy recorder of deeds, Furlong v. Gudknecht, 808 F.2d 233, 236-37 (3d Cir.1986); see also Savarese v. Agriss, 883 F.2d 1194 (3d Cir.1989) (affirming on other grounds jury verdict that the director of a county transportation authority was improperly fired for political reasons). On the other hand, we have held that party affiliation may be the basis for dismissal of an assistant director of public information, Brown v. Trench, 787 F.2d 167, 169-70 (3d Cir.1986); assistant district attorneys, Mummau, 687 F.2d at 10; and city solicitors and assistant city solicitors, Ness, 660 F.2d at 522-23.
 
 
 23
 In each of these cases, we examined the functions performed by the individual occupying the relevant position, for, as the Supreme Court has explained, "[t]he nature of the responsibilities is critical." Elrod, 427 U.S. at 367, 96 S.Ct. at 2687. Although "[e]ach decision is ... fact specific for that case," Zold, 935 F.2d at 635, a question relevant in all cases is "whether the employee has 'meaningful input into decision making concerning the nature and scope of a major [government] program.' " Brown, 787 F.2d at 169-70 (quoting Nekolny v. Painter, 653 F.2d 1164, 1170 (7th Cir.1981), cert. denied, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982)). Therefore, it is appropriate to consult factors such as "whether the employee's duties are simply ... nondiscretionary or technical, ... whether the employee participates in ... discussions or other meetings, whether the employee prepares budgets or has authority to hire or fire employees, the salary of the employee, and the employee's power to control others and to speak in the name of policymakers." Id. at 169 (citations omitted).
 
 
 24
 Equally as important, we have focused our analysis on "the function[s] of the public office in question and not the actual past duties of the particular employee involved." Id. at 168; see also O'Connor v. Steeves, 994 F.2d 905, 911 (1st Cir.1993) ("the actual past duties of the discharged employee are irrelevant if the position inherently encompasses more expansive powers and more important functions that would tend to make political affiliation an appropriate requirement for effective performance" (citation omitted)). A significant way to determine the functions inherent in a particular position is to examine relevant state statutes, for "[a]lthough state law is not necessarily dispositive of the inquiry whether an employee is a confidant, policymaker or other employee for whom political affiliation is appropriate under Elrod, it is an important and influential factor." Zold, 935 F.2d at 640.
 
 
 25
 We explained the importance of conducting such a generalized level of inquiry in Ness, where we held that plaintiffs' contention that they performed only ministerial tasks as city solicitors and assistant city solicitors did not create a factual dispute precluding summary judgment. "That a city solicitor in a similar position could conceivably operate in such a legal/technical manner is a possibility that need not concern us here. Neither need we decide whether the plaintiffs in fact limited themselves to the role they described." 660 F.2d at 521. Rather, we reasoned that "[u]nder the Administrative Code it is contemplated that a mayor might rely upon the city solicitors for the legal advice necessary to implement policy. That one mayor may have chosen not to employ the solicitors in this manner should not stand as a bar to future mayors relying on solicitors to the extent allowed by the Code." Id. at 522.
 
 
 26
 It is with these general principles in mind that we turn to an analysis of the duties performed by the Director.
 
 IV.
 Functions Performed by the Director
 A.
 Statutory Framework
 
 27
 The position of Director of the Division of Veterans' Administrative Services is discussed in three places in the section of the New Jersey code entitled "Military and Veterans Law." Section 38A:3-2c provides that:
 
 
 28
 The Division of Veterans' Administrative Services shall be under the immediate supervision of a director who shall be an honorably discharged veteran qualified by training and experience to direct the work of the division. The director shall be appointed by the Adjutant General, with the approval of the Governor, and shall serve at the pleasure of the Adjutant General.
 
 
 29
 N.J.Stat.Ann. Sec. 38A:3-2c. The functions performed by the Division are set forth in section 38A:3-2b, which provides that the Division shall "[s]upervise and operate" the three veterans' nursing homes and the veterans' memorial cemetery. In addition, the Division is "directed to establish a program to oversee the transfer of the remains of veterans from paupers' or potters' cemeteries to the Arneytown Veterans' Memorial Cemetery," and to inform the public of the existence of this service. Id. Sec. 38A:3-2b1.
 
 
 30
 Although the statute merely provides that the Director's salary is to be established by the Adjutant General, see id. Sec. 38A:3-2h, it is undisputed that Waskovich was paid $64,000 per year. Nor is it disputed that the Division he manages is the largest in the Department, overseeing approximately 1,000 employees. Included within the Division are four advisory councils, one for each nursing home and one for the cemetery. The councils are composed of seven members each, who are appointed for three-year terms without pay by the Adjutant General with the approval of the Governor. Id. Sec. 38A:3-6.13. They are charged with, inter alia, recommending eligibility requirements and standards of care, treatment, and discipline for the facilities, in accordance with the general policies established by the Adjutant General. Id. Sec. 38A:3-6.14.
 
 
 31
 Above the Director in the DMVA hierarchy is the Administrator of Veterans' Affairs, who is appointed by the Governor with the advice and consent of the state Senate. Under the supervision of the Adjutant General, the Administrator directs and oversees the activities of the three Divisions within the Department, including the Division of Veterans' Administrative Services. Id. Sec. 38A:3-4.1.[6]
 
 
 32
 The next highest position in the Department is that of the Deputy Adjutant General, who is appointed by the Governor upon the nomination of the Adjutant General. The Deputy, who has the authority to act on behalf of the Adjutant General during his or her absence or disability, performs any duties prescribed by the Adjutant General. Id. Sec. 38A:3-5.
 
 
 33
 The "head of the Department" is the Adjutant General, a member of the Governor's staff. Id. Secs. 38A:2-2, 38A:3-3. Appointed by the Governor with the advice and consent of the Senate, s/he is vested with the power, inter alia, to "[e]xercise control over the affairs of the Department," to "make and issue such regulations governing the work of the Department ... and the conduct of its employees as may, in his judgment, be necessary or desirable," and to "appoint and remove officers and other personnel employed within the [D]epartment" subject to state civil service restrictions. Id. Sec. 38A:3-6(a) & (k). The Adjutant General is also required to "[s]upervise and operate" the three nursing homes and the veterans' cemetery. Id. Sec. 38A:3-6(u).
 
 
 34
 These positions, together with the two other Division Directors, see supra note 6, are the only ones whose functions are described in the statute. Although the DMVA employs numerous other individuals, ranging from officers of the organized militia to the chief executive officers of the nursing homes to clerks, see N.J.Stat.Ann. Sec. 38A:3-2; App. at 250, 311, their responsibilities within the Department have not been enumerated by the legislature.
 
 
 35
 Taken together, we believe these provisions of the statute create a presumption, albeit a rebuttable one, that there is no First Amendment prohibition against considering political affiliation as a requirement for the position of Director. As an initial matter, we note that the Director is appointed by and serves at the pleasure of the Adjutant General, a public official whose broad and discretionary responsibilities clearly exempt him from the protection of Branti and Elrod.[7] Significantly, the Director's appointment must also be approved by the Governor.
 
 
 36
 Of greater consequence than the conditions under which the Director may be appointed and removed are the duties that the Director performs in conjunction with the Administrator and the Adjutant General. The statute makes clear that the power to manage the veterans' nursing homes and cemetery is shared by these officials. The Adjutant General is authorized to "[s]upervise and operate" these facilities, id. Sec. 38A:3-6(u), to establish rules and regulations concerning "eligibility for admission" to the facilities, and to "establish standards of care, treatment and discipline governing the relationships between the veterans' facilities and persons admitted thereto," id. Sec. 38A:3-6.4. The Director runs the Division that "[s]upervise[s] and operates" these same facilities, id. Sec. 38A:3-2b, and the Administrator, in turn, "direct[s] and oversee[s]" the Director's activities. Id. Sec. 38A:3-4.1.
 
 
 37
 Although under this statutory framework the Adjutant General is vested with greater powers than the Director, we believe the statute contemplates that the Adjutant General will look to the Director for policy advice concerning the veterans' nursing homes and the cemetery. As the District of Columbia Circuit explained in Hall v. Ford, 856 F.2d 255, 263 (D.C.Cir.1988), "[h]igh level officials must be permitted to accomplish their organizational objectives through key deputies who are loyal, cooperative, willing to carry out their superiors' policies, and perceived by the public as sharing their superiors' aims; this is true whether or not those officials are elected." See also id. ("The exception for patronage dismissals of certain employees reflects the importance of allowing officials at the top of the organizational hierarchy to implement their policies through politically compatible deputies."); Grossart v. Dinaso, 758 F.2d 1221, 1226 (7th Cir.1985) ("Elected officials must be able to rely on the political loyalty and compatibility of a policymaking civil servant in order to seize the reigns [sic] of government and realize their electoral mandate.").
 
 B.
 
 38
 Functions Actually Performed by the Director
 
 
 39
 Although, as we have noted above, the actual duties performed by officeholders are not determinative, they may be informative.[8] Waskovich testified on direct examination that he was responsible for "oversee[ing] the day to day operations of the facilities and meet[ing] with other people and [answering] questions from my superiors, investigat[ing] things my superiors wanted me to look at and ... advocat[ing] for the veterans that were in our care there." App. at 101. He stated that his "normal work week" consisted of submitting his schedule to his superiors for approval, reviewing correspondence and writing letters, attending staff meetings with his superiors and with the directors of the facilities, researching issues raised by his superiors, and inspecting the nursing homes and the cemetery. Finally, he explained that he did not have final decision-making authority over such "broad-based major policy matters" as capital improvements, admissions requirements, the closing of facilities or the hiring or firing of personnel within his Division. App. at 135, 140-41.
 
 
 40
 However, in answering specific questions concerning the scope of his responsibilities, Waskovich painted a substantially broader picture of his role as Director. For example, Waskovich acknowledged that he met with veterans advocacy groups and with individual veterans who had problems. At these meetings, Waskovich "sp[oke] about what was going on in the homes," App. at 100, including "the need for additional staffing and additional care," App. at 116.
 
 
 41
 Although Waskovich testified that the budget he submitted to the Adjutant General consisted of adding together the individual budgets of the three nursing homes and the cemetery, when asked whether he "participate[d] in any further meetings regarding the review of that budget," he acknowledged that his superiors "might ask me questions on certain issues and if I felt it was justified or whatever." App. at 139. In addition, Waskovich acknowledged that he was involved in policy matters on a day-to-day basis, that he made recommendations on policy matters on several occasions, that his superiors asked for his views of major policy proposals such as capital improvement programs, and that he often opposed policies they espoused.
 
 
 42
 For example, Waskovich expressed his opposition to a proposal to limit the authority of the nursing home Chief Executive Officers (CEOs) to dismiss their employees and to transfer that authority to a Personnel Director within the Department. He explained that "[i]t would be ludicrous to come in and have a Colonial [sic] in the National Guard, who is in charge of personnel, take charge of staffing and remove nurses from a wing and endanger the health and welfare of our older veterans who were laying sick in bed there." App. at 108. When asked whether he "advocated that the power or decision-making would remain with the CEO's in the nursing home[s]," Waskovich responded: "I advocated that they [DMVA officials] follow the law, that the Department of Health requires the CEO to run the home and that's the way it had to be." App. at 109. Waskovich's position on this issue is confirmed by a May 24, 1990 memorandum to the Deputy Adjutant General in which he stated, "I do not recommend this policy." App. at 283.
 
 
 43
 Waskovich also testified that he "regularly opposed" the policy advocated by the Adjutant General to reduce and transfer nursing home staff, because Waskovich was concerned about its impact on the veterans residing in the homes. App. at 110. In response to a May 21, 1990 memorandum from the Deputy Adjutant General suggesting the transfer of seventeen residents of the Menlo Park nursing home to the Paramus home, Waskovich expressed his strong disagreement, stating that "this should be discussed in depth at a CEO staff meeting before a decision like this is recommended." App. at 297.
 
 
 44
 Finally, Waskovich stated that he participated in numerous staff meetings, both on a departmental and a divisional level. Specifically, Waskovich met on a monthly basis with the Deputy Adjutant General and the other Directors. He also met periodically with the members of his Division's staff, which included the Deputy Director of Veterans' Administrative Services, the three nursing home CEOs, and the nursing home medical directors. The minutes of several of these meetings, which were introduced at the evidentiary hearing, confirm that Waskovich expressed his views on such issues as the authority of nursing home CEOs to fire their staff, the shortage of doctors in the nursing homes, and the suggested adjustments to the financial guidelines for admitting veterans to the homes.
 
 
 45
 Although Waskovich's testimony alone demonstrates that he was actively involved in formulating and implementing (or more frequently, in opposing) policies applicable to the facilities under his control, the testimony of Joseph Loudermilk, Waskovich's successor, provides additional insight as to the scope of the functions that are inherent in the Director's position, even if Waskovich himself did not engage in those activities. Although Waskovich had had no prior experience in operating a nursing home before his appointment as Director, Loudermilk had been Chief Executive Officer of the Paramus nursing home for approximately four years before his appointment.
 
 
 46
 Loudermilk stated that he was frequently asked to speak on behalf of the Department to various veterans organizations and that he consulted with the Adjutant General and Deputy Adjutant General prior to these meetings. He was also asked to develop uniform policies for admission to the nursing homes and to assist in drafting the nursing home regulations. When asked whether "the kind of policies you were asked to create were identified to you in [the Adjutant General's] order," Loudermilk stated that "[t]hey were left up to me as a professional who knows the business of hospitals and nursing homes." App. at 257.
 
 
 47
 Loudermilk's testimony was substantiated by the testimony of the individual defendants. Adjutant General Morgano testified that he relies on the Directors for information concerning "running the day to day operations, advising me of all the operations that are going on [at] all the sites, giving me advice on what changes to make and things to do." App. at 152. Specifically, Morgano testified he relies on Loudermilk for confidential advice. In short, Morgano, Deputy Adjutant General Taylor and Deputy Commissioner Bernard all confirmed that Loudermilk has substantial involvement in policymaking at the Department.
 
 C.
 Relevance of Political Affiliation
 
 48
 Waskovich argues that the statements by Deputy Adjutant General Taylor that "party affiliation is not a qualification for the job of [D]irector of Veterans' Administrative Services," App. at 228, and by Deputy Commissioner Bernard that political affiliation does not play a part in whether the Director retains his job, App. at 242, create a factual dispute precluding summary judgment. We do not agree. Both testified to the importance of the Director's sharing the same general philosophy as that of his or her superiors. App. at 173 ("It is extremely important that ... we are all in concurrence in regard to the philosophy that the Department has adopted, to [e]nsure that the policy has been carried out."); App. at 243 (stressing the importance of Director and his superiors sharing the same "philosophical judgment").
 
 
 49
 Differences in philosophy arising in the course of interaction between the Director of Veterans' Administrative Services and the Adjutant General or others in the administration could indeed stem from political differences and have political ramifications. Put another way, the Director is obviously in a position where he could cause serious political embarrassment to the administration. See generally Jiminez Fuentes v. Torres Gaztambide, 807 F.2d 236, 241-42 (1st Cir.1986) (en banc) (as first step in conducting Branti/Elrod analysis, court examined the questions: "does the position involve government decisionmaking on issues where there is room for political disagreement on goals or their implementation? Otherwise stated, do party goals or programs affect the direction, pace, or quality of governance?"), cert. denied, 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987). Thus Taylor's and Bernard's statements do not create a material issue of fact on the ultimate issue whether the Adjutant General, the only official who is vested with the statutory authority to appoint or dismiss the Director, has a valid basis to prefer that an individual from the same political party fill a politically-sensitive policymaking position such as that of Director. Cf. Ness, 660 F.2d at 522 ("[W]hile it is conceivable that a governor might employ speech writing assistants without regard to their political affiliation, we would not want to prevent governors in general from using political affiliation as a criterion for such positions."); Mummau v. Ranck, 531 F.Supp. 402, 405 (E.D.Pa.) (future employers "should not be bound by the restrictive functions and office assignments which antedate their tenure"), aff'd, 687 F.2d 9 (3d Cir.1982) (per curiam).
 
 
 50
 The potential political sensitivity of the Director's position is evident from the legislative findings enacted as part of the statute. They include, for example, a finding that "there are approximately 900,000 veterans with service in time of war or conflict residing in New Jersey...." N.J.Stat.Ann. Sec. 38A:3-1.1(b). The legislature determined that "[i]t is in the public interest to incorporate various services and programs which pertain specifically to veterans and their dependents into an executive department which can serve their needs more efficiently than is possible at present." Id. Sec. 38A:3-1.1(f). These findings suggest the existence of a large constituency of veterans for whom the appropriate provision of services may well be an election issue.[9]
 
 
 51
 Those few cases to have considered the propriety of dismissing government officials who orchestrate the provision of veterans' services support this conclusion. In Pounds v. Griepenstroh, 970 F.2d 338 (7th Cir.1992), the Seventh Circuit rejected the claim that Branti and Elrod precluded dismissal of a county Veteran's Service Officer (VSO) whose primary responsibility is to assist veterans who reside in the county in obtaining benefits. In concluding that the VSO could be dismissed on the basis of his political affiliation, the court stressed the political implications associated with the provision of benefits to veterans, even at the county level.
 
 
 52
 [C]ounty VSOs provide aid to local veterans, and it is possible that someone running for the elected position of commissioner could make promises to the public, and in particular the veterans, as to how the allocated funds will be used in social programs. When elected, the commissioner has every reason to believe that the only way to fulfill these promises is to appoint a VSO with a similar ideology.
 
 
 53
 Id. at 343; see also Tomczak v. City of Chicago, 765 F.2d 633, 641 (7th Cir.) (holding that Director First Deputy Commissioner of Chicago's Water Department could be dismissed on the basis of his political affiliation and stating that "[e]lections often turn on the success or failure of the incumbent to provide [public] services"), cert. denied, 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985).
 
 
 54
 Although the VSO in Pounds possessed substantially greater discretion over budgetary matters than did Waskovich, we do not find that distinction to be dispositive. We focus instead on the substantial role played by Waskovich (and Loudermilk) in representing the DMVA at public meetings and in meetings with state veterans groups. It was this factor which we found to be dispositive in Brown, where we held that an assistant director of public information could be dismissed on the basis of her party affiliation because "her principal duty was to act as spokesman for the [county] Commissioners and help promote county projects." 787 F.2d at 170.
 
 
 55
 This factor was also relied on by the Second Circuit in Savage v. Gorski, 850 F.2d 64 (2d Cir.1988), the only other federal appellate court to have considered the propriety under Branti and Elrod of dismissing a government official involved in facilitating the provision of veterans' benefits. The court in Savage declined to afford First Amendment protection to a First Deputy Service Officer of a County Veterans Service Agency. The Officer, who had an annual salary of $32,000, "maintain[ed] outside contacts with veterans' service organizations, attend[ed] public meetings regarding county proposals affecting veterans, and g[ave] extemporaneous talks on county veterans' programs." Id. at 66. He also ran the agency and interviewed veterans to determine whether they qualified for benefits. Id. at 69.
 
 
 56
 The record in this case reveals that Waskovich's and Loudermilk's interaction with veterans' organizations and with the public was similar to that noted in Savage. In addition, the Director, like the plaintiff in Brown, has undisputed "meaningful input into decision making concerning the nature and scope of a major [government] program." 787 F.2d at 169-70. Waskovich cites no case in which a public official who was as high as the Director in the government hierarchy, had responsibility for a comparably large budget, supervised almost 1,000 employees, and was looked to by his or her superiors for policy recommendations was held to be exempt from dismissal for reasons of political affiliation. Thus, we agree with the district court that the undisputed statements made at the hearing, together with the documents admitted as exhibits, demonstrate as a matter of law that the individual occupying the position of Director of Veterans' Administrative Services may be dismissed on the basis of his or her political affiliation.
 
 V.
 Conclusion
 
 57
 For the foregoing reasons, we will affirm the order of the district court granting summary judgment for the defendants.[10]
 
 
 
 [1]
 Both the Adjutant General and the Administrator are appointed by the Governor with the advice and consent of the Senate, N.J.Stat. Ann. Secs. 38A:3-3 & 38A:3-4.1, and the Deputy Adjutant General is appointed by the Governor upon the nomination of the Adjutant General, id. Sec. 38A:3-5
 
 
 [2]
 Waskovich has not appealed this aspect of the district court's ruling
 
 
 [3]
 The district court also denied as moot Waskovich's motion for reconsideration of its earlier ruling that the defendants were entitled to qualified immunity. See Waskovich, 800 F.Supp. at 1227
 
 
 [4]
 The Rule states in relevant part:
 The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
 
 
 [5]
 The following statement in the court's opinion filed after the hearing is surprising:
 The court recognizes that there exists a factual dispute concerning the role and function of the Director of Veterans' Administrative Services. Nevertheless, because a question of law, concerning the issue of whether plaintiff falls within the ambit of the First Amendment protection against political firing, necessitates the resolution of the factual dispute, the court will decide the factual dispute.
 Waskovich, 800 F.Supp. at 1221 n. 1. Several sentences later, however, the court stated that it would "resolve the issue presented here by confining its analysis to the statute creating the position of [D]irector," id., and, as noted in the text, it relied only on undisputed information.
 
 
 [6]
 The other two Divisions with the DMVA are the Division of Veterans' Loans, Grants and Services and the Division of Veterans' Training, Information and Referrals. N.J.Stat.Ann. Secs. 38A:3-2d, 38A:3-2f
 
 
 [7]
 The courts have differed on the significance of a position's exemption from civil service protection. Compare Stott v. Haworth, 916 F.2d 134, 142 (4th Cir.1990) (exemption creates presumption that dismissal on basis of political affiliation is permissible) with Regan v. Boogertman, 984 F.2d 577, 580 (2d Cir.1993) (exemption does not give rise to such presumption). We agree with the court in Regan that such an exemption is one of the factors to be considered in determining whether a dismissal on political grounds offends the First Amendment. See id.; see also Zold, 935 F.2d at 638-39 (discussing importance of legislature's decision to provide tenure to municipal clerks)
 
 
 [8]
 The district court relied heavily on Defendants' Exhibit 7, which appears to be a job description for the position of Director of the Division of Veterans' Administrative Services. See Waskovich, 800 F.Supp. at 1225-26. However, Waskovich testified that he did not recognize the document and Loudermilk was not questioned about its contents. Although Deputy Adjutant General Taylor stated that the exhibit contained an accurate description of the Director's responsibilities, given that neither Waskovich nor Loudermilk explained whether he had performed the functions listed, we are unwilling to rely on the exhibit as a basis for our decision in this case
 
 
 [9]
 The Governor's statement to the Assembly concerning the statute also indicates that politics plays a role in the provision of veterans' services in New Jersey
 Over the past few years, I have supported the building of a new veterans' nursing home, the addition of several veterans' service centers and the creation of New Jersey's first veterans' cemetery. In the current fiscal year, I have supported over $27 million in funding for the current Division of Veterans' Programs and Special Services within the Department of Human Services, as well as additional funding for veterans' programs in the Departments of Higher Education, Labor and Treasury.
 Governor's Reconsideration and Recommendation Statement, Assembly, No. 5327--L.1987, c. 444, reprinted in N.J.Stat.Ann. following Sec. 38A:3-1.1.
 
 
 [10]
 Our conclusion that Waskovich's dismissal did not violate the First Amendment necessarily disposes of his challenge to the district court's grant of summary judgment for the defendants on the ground of qualified immunity