

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-23-1998

# Boyle v. County of Allegheny

Precedential or Non-Precedential:

Docket 97-3222

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Boyle v. County of Allegheny" (1998). *1998 Decisions.* Paper 55.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/55

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 23, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-3222

PATRICK J. BOYLE,

      Appellant,

v.

COUNTY OF ALLEGHENY PENNSYLVANIA; LARRY DUNN,
COMMISSIONER, in his individual capacity;
BOB CRANMER, COMMISSIONER, In his
individual capacity,

      Appellees

On Appeal from the United States District Court
for the Western District of Pennsylvania
(Dist. Ct. Civil Action No. 96-141)

Argued November 17, 1997

BEFORE: SCIRICA and LEWIS, CIRCUIT JUDGES, and
ACKERMAN, DISTRICT JUDGE*

(Filed: March 23, 1998)

        Samuel J. Cordes, Esq. (Argued)
        OGG, JONES, CORDES & IGNELZI,
        L.L.P.
        245 Fort Pitt Boulevard
        Pittsburgh, PA 15222

         Attorney for Appellant

_____

* Honorable Harold A. Ackerman, Senior Judge of the United States
District Court for the District of New Jersey, sitting by designation.

        Kurt A. Miller, Esq. (Argued)
        Terrence M. Lewis, Esq.
        THORP, REED & ARMSTRONG
        One Riverfront Center
        Pittsburgh, PA 15222

         Attorneys for Appellees

OPINION OF THE COURT

HAROLD A. ACKERMAN, Senior District Judge:

This appeal arises out the employment termination of appellant Patrick J. Boyle ("Boyle") by the County of Allegheny, Pennsylvania from his position as Deputy Director of Marketing and Communications in the county's Department of Aviation. Boyle, a Democrat, alleged in his complaint that he was terminated based on his political affiliation in violation of the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. S 1983. Boyle sought reinstatement to the position of Deputy Director, various other equitable relief and compensatory and punitive damages for pain, suffering, emotional distress and humiliation resulting from his allegedly unlawful termination.

While denying that he was terminated for his political affiliation, defendants/appellees moved for summary judgment in the district court contending that even if he were, such a termination was proper under Elrod v. Burns, 427 U.S. 347 (1976), Branti v. Finkel, 445 U.S. 507 (1979), and their progeny. Boyle opposed the motion, relying in large measure on the deposition testimonies of two of the three members of the Board of Commissioners of Allegheny County. These Commissioners testified that political affiliation was not an appropriate requirement for the position of Deputy Director of Marketing and Communications.

The district court granted defendants' motion for summary judgment, concluding that the deposition testimonies of the two Commissioners were not significantly probative on the question of whether political affiliation was

2

an appropriate requirement for the position held by Boyle under Supreme Court and Third Circuit case law. This Court has jurisdiction pursuant to 28 U.S.C. S 1291.

We reverse.

I. Factual Background

The Board of Commissioners of Allegheny County has traditionally been a stronghold for the Democratic Party. For nearly fifty years, until 1995, the three-member Board was comprised of a Democratic majority. In 1995, however, two Republican Commissioners, Larry Dunn and Bob

Cranmer,1 were elected, and the Board became a Republican majority.

Boyle was hired by Allegheny County as Deputy Director in its Department of Aviation on January 21, 1986. By letter, dated December 21, 1995, Dunn and Cranmer, as Commissioners-elect, demanded plaintiff 's resignation based upon their belief that "those in management and leadership positions, appointed to our new administration, share our priorities of government." When the new Republican-dominated Board took office in January, 1996, the county terminated the employment of a number of directors and deputy directors, including Boyle. Boyle contends in his suit that he was terminated because he was a registered Democrat and he supported the election campaigns of Democratic candidates for county Commissioner.

A. Job Duties and Responsibilities

The Deputy Director position was a third level management position in the governmental hierarchy in Allegheny County with respect to the Department of Aviation. Boyle reported directly to the Director, who in turn, reported to the Board of Commissioners. The positions reporting directly to the Deputy Director included the manager of public relations, senior administrative officer/capital projects, marketing analyst, information clerk supervisor and senior secretary.

_____

1. The lone Democrat remaining on the Board was Michael Dawida.

3

At some time during his employment, Boyle drafted a job description for the position of Deputy Director of Marketing and Communications.2 Boyle characterized his position as a management level staff position "designed to carry out policy decisions by the Director of Aviation and the County Commissioners . . . [and to] interpret policy requirements, act and sign documents on behalf of the director, speak to news media on the record, and initiate or respond to public affairs activities as required." He was "responsible for planning, preparing, and executing all communications, marketing and development programs for the aviation system, as well as coordinating public affairs and community relations activities, and the airport public information program."

The job description listed the Deputy Director's "Major Duties" as follows:

(1) Supervise and manage all activities of the marketing, community relations, and public information functions of the aviation system.

(2) Develop and prepare written material for public dissemination, including news releases, marketing reports, newsletters and correspondence.

(3) Maintain contact with prospective and present clients and tenants.

(4) Develop and coordinate program to deal with complaints, passenger relations with airport tenants, and other travelers' concerns, especially insofar as these activities affect airport operations and maintenance.

(5) Monitor and review any airport problem that may be apparent to the public, and advise the appropriate section of such problems and any public relations ramifications.

(6) Observe and interpret accidents, emergencies, and disaster scenes to determine how best to handle the response by news media.

_____

2. Boyle testified in his deposition that the job description, in general, accurately described the duties he had as Deputy Director.

(7) Coordinate and authorize news coverage of any activity in the airport, assist the news media in covering events and staff the emergency communications center when necessary and provide needed logistical support to media.

(8) Serve as authorized airport spokesman.

(9) Manage or assist special projects required to support airport mission, for instance, dedicating new buildings, hosting VIP tours, sponsoring seminars, etc.

(10) Coordinate airport initiatives and responses in rate cases, new service opportunities, development projects, etc.

(11) Oversee information clerks and disbursal of information from airport information desks. Regulate material given out at information desks.

(12) Prepare correspondence for director and commissioners.

(13) Advise Director and Commissioners about protocol, background and ramifications of events, opportunities, proposals, etc.

(14) Develop and manage programs for airport tours and speakers' bureau. Liaison with tenants to include wide array of resources for public information.

(15) Stand in for the Director at Commissioners' meetings in his absence.

(16) Develop in-service training programs and other educational programs to educate staff and maintain current awareness of significant issues.

(17) Approve all information from the Department that will be disseminated to the public.

(18) Maintain logs of tours, visitors, speakers, meetings, events and airport business, and prepare reports reflecting all airport activities on a regular basis for Director and Commissioners.

(19) Liaison with regional groups such as Penns Southwest, Chamber of Commerce, R.I.D.C., Convention & Visitors Bureau, and business groups.

5

(20) Manage contracts and programs to market and promote the airports, the County or the region, including supervision of consultants for advertising, marketing, promotion, etc.

In addition, Boyle completed a "Job Evaluation Questionnaire" in May, 1994 which, among other things, asked him to describe "the specific duties and responsibilities involved in doing your job." The top five duties and responsibilities were as follows: (1) Crisis Management/Problem Solving; (2) Media Relations; (3) Internal Communications/Information Services; (4) Policy Implementation/Advice; and (5) Community Relations/Public Affairs. Boyle also acknowledged that a crucial part of his job was to "influence, promote and sell" to community and professional contacts. With regard to the level of guidance necessary to perform his job, Boyle checked the category "Broad," which was defined as:

> With managerial responsibility, there is latitude for decision making and setting of priorities. Long range projects (over one year) are assigned which are reviewed through achievement of objectives, according to predefined goals.

Boyle also acknowledged that "the effect of typical errors made in the course of performing the duties of this job" would have a "[s]ignificant impact affecting major programs, or corporate objectives, impairing the performance of the Department of Aviation," and that he had "[c]omplete freedom for independent judgment and discretion."

A further glimpse into Boyle's duties and responsibilities is provided by letters sent by him to prospective employers. For instance, in a letter, dated November 24, 1995, to a general manager at the Metropolitan Washington Airports Authority, Boyle stated that he was hired by Allegheny County to "assist in lobbying, planning, building and dedicating a new billion dollar airport." This project, according to Boyle, involved "extensive negotiations with Federal and State officials, airlines, and the construction industry, and included considerable interaction with community groups." In another letter seeking a position at the Pittsburgh Foundation, dated May 23, 1996, Boyle

6

stated that as Deputy Director, he "served as airport spokesman and managed all public affairs, marketing and communications."

A letter of recommendation from the chairman of the county Commission, Tom Foerster, which was drafted by Boyle himself, stated that Boyle joined the chairman's staff in 1986 "to line up state funding for Strategy 21 and persuade USAir to build the Midfield Terminal." He further stated that Boyle "has been of great value . . . for many years as a speech writer, corresponding secretary, and trouble-shooter at the airport."

After his termination, Boyle applied for unemployment benefits. In a questionnaire completed by Boyle, he stated that his duties as Deputy Director were to "manage communications and public relations for [the] airport," that he had "full discretion and responsibility," and that he "had full authority to make and implement decisions."

In deposition testimony, Boyle acknowledged that as Deputy Director, he would report to the Commissioners on various matters, including the ramifications of various policies and proposed policies of the Commissioners. Boyle

would also occasionally sit in on county Board meetings on behalf of the Director. The Board's minutes reveal that Boyle engaged in discussions with the Commissioners on various issues affecting the Department of Aviation. The minutes further reflect that Boyle at times made formal Requests for Board Action on behalf of the Director.

Significantly, in a letter, dated October 31, 1995, Boyle stated that "[f]or the past 10 years, I have been deputy director of Pittsburgh International Airport, and have served informally as Commissioner Tom Foerster's director of correspondence."

At the time of his termination, Boyle's annual salary was $57,035.52.

B. Deposition Testimonies of Commissioners

In his deposition, Cranmer, one of the new Republican Commissioners on the Board, testified that the position of Deputy Director did not require a certain political affiliation:

> Q. If you were listing requirements for the deputy director of marketing and communications at the aviation department, would affiliation with one political party or another be a requirement for that?
>
> A. No.
>
> Q. Would support of one candidate in the last election or not --
>
> A. No.
>
> Q. You've got to let me finish. Would support of one candidate in the last election be an appropriate requirement for the position of deputy director of marketing and communications?
>
> A. No.

Mr. Cranmer further testified that there was no "rational connection between political affiliation" and the position of Deputy Director, contradicting the defendants' answers to interrogatories on this issue. Mr. Cranmer stated in no uncertain terms that he did not "agree with the fact that a political affiliation has anything to do with this job, has nothing to do with it."

Michael Dawida, the lone Democratic Commissioner on the Board, provided similar testimony:

> Q. Commissioner, does the position of deputy director of marketing and communications for the Department of Aviation require that a person have a certain political affiliation?
>
> A. No. Absolutely not.
>
> Q. Does the fact that one is either a Democrat or Republican affect that person's ability to do the job?
>
> A. Absolutely not.
>
> Q. Does the fact that the person in that position supported one political party of the other political party affect his or her ability to do the job?
>
> A. No.

8

> Q. Does the fact that the person in that position supported one candidate over another in a prior election affect his or her ability to do that job?
>
> A. No.

Confronted with seemingly strong evidence that Boyle's position allowed him to have meaningful input into significant issues affecting the county, on the one hand, and the deposition testimonies, on the other, the district court chose the former, and granted the defendants' motion for summary judgment:

> [T]he undisputed facts demonstrate that plaintiff 's duties as Deputy Director were of broad scope, that plaintiff acted as an advisor to policymakers and that plaintiff participated in discussions and other meetings with policymakers and had the authority in some instances to act and speak on behalf of policymakers. The Court, therefore, finds as a matter of law that the duties inherent in the position of Deputy Director are such that political ideology is an appropriate requirement for the effective performance of that position. Accordingly, terminating plaintiff from the Deputy Director position because of plaintiff 's political affiliation would not offend the First Amendment.

Memorandum Op. at 19.

The significance of the deposition testimonies of Cranmer and Dawida was disposed of in a footnote as follows, in its entirety:

> Plaintiff's reliance on the deposition testimony of two County Commissioners, that is, Cranmer and Dawida, in that those individuals testified that party affiliation is not an appropriate requirement for the Deputy Director position does not affect the Court's conclusion. In light of the undisputed evidence regarding plaintiff's authorized and actual duties as Deputy Director, the Court finds that the cited deposition testimony does not create a genuine issue of material fact. See Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994) ("There must be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the

9

> evidence is merely colorable or not significantly probative, summary judgment should be granted.").

Id. at 20 n.7.

Had the district court been sitting as the finder of fact, we would have little trouble in affirming its decision. However, at the summary judgment stage, the district court improperly weighed conflicting evidence in granting the defendants' motion. The deposition testimonies of two of the three members of the Board of Commissioners, which constituted the relevant hiring authority in this case, created a genuine issue of material fact as to whether the position of Deputy Director of the Department of Aviation was subject to the Elrod/Branti exception. Accordingly, this court is constrained to reverse the district court's decision and remand for further proceedings.

II. Discussion

This Court exercises plenary review of the district court's granting of summary judgment. See Torre v. Casio, Inc., 42 F.3d 825, 830 (3d Cir. 1994). Accordingly, "the appellate court is required to apply the same test the district court should have utilized." Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir.) (en banc), cert. dismissed, 483 U.S. 1052 (1987); see also Sempier v. John & Higgins, 45 F.3d 724, 727 (3d Cir.), cert. denied, 515 U.S. 1159 (1995).

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will be granted

> if the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with
> the affidavits, if any, show that there is no genuine
> issue of material fact and that the moving party is
> entitled to a judgment as a matter of law.

See also Todaro v. Bowman, 872 F.2d 43, 46 (3d Cir. 1989);
Chipollini, 814 F.2d at 896. In other words, "summary
judgment may be granted if the movant shows that there
exists no genuine issue of material fact that would permit
a reasonable jury to find for the nonmoving party." Miller v.
Indiana Hosp., 843 F.2d 139, 143 (3d Cir.), cert. denied,
488 U.S. 870 (1988). All facts and inferences are construed
in the light most favorable to the non-moving party. Peters

10

v. Delaware River Port Auth. of Pa. and N.J., 16 F.3d 1346,
1349 (3d Cir.), cert. denied, 513 U.S. 811 (1994).

The substantive law will identify which facts are
"material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
247-48 (1986). Therefore, "[o]nly disputes over facts that
might affect the outcome of the suit under the governing
law will properly preclude the entry of summary judgment."
Id. An issue is "genuine" if a reasonable jury could possibly
hold in the nonmovant's favor with regard to that issue. Id.

However, at the summary judgment stage, a court may
not weigh the evidence or make credibility determinations;
these tasks are left to the fact-finder. Petruzzi's IGA
Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d
1224, 1330 (3d Cir.), cert. denied, 510 U.S. 994 (1993).
Therefore, to raise a genuine issue of material fact, " `the
[summary judgment] opponent need not match, item for
item, each piece of evidence proffered by the movant,' but
simply must exceed the `mere scintilla' standard." Id.; see
also Anderson, 477 U.S. at 252 ("The mere existence of a
scintilla of evidence in support of the [nonmovant's]
position will be insufficient; there must be evidence on
which the jury could reasonably find for the [nonmovant].").

It is clear, however, that if a moving party satisfies its
initial burden of proving a prima facie case for summary
judgment, the opposing party "must do more than simply
show that there is some metaphysical doubt as to material
facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 586 (1986). Rather, "[t]here must be
sufficient evidence for a jury to return a verdict in favor of
the non-moving party; if the evidence is merely colorable or
not significantly probative, summary judgment should be

granted." Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994).

The primary issue raised on appeal is fairly straightforward: whether the district court erred in discounting the statements made by two of the three Allegheny County Commissioners--to the effect that political affiliation was not an important factor for the job of Deputy Director of Marketing and Communications in the county's Department of Aviation--in granting the

11

defendants' motion for summary judgment. Boyle argues in his appeal that the district court engaged in an improper weighing of the evidence. The statements made by the two Commissioners, Boyle contends, constitute admissions, and thus, the district court erred in finding that they lacked any probative significance. We agree.

In arguing for affirmance of the district court's decision, appellees characterize the deposition testimonies as "probative of nothing." Appellee's Brf. at 38. Appellees argue that whatever statements may have been made by the two Commissioners, the legal test remains whether the authorized duties and functions of the employee's position is confidential or policymaking. The statements by the Commissioners, according to the appellees, shed no light on the factors which both the Supreme Court and this court have held to be relevant.

While it is true that both the Supreme Court and this court have developed various formulations to be applied in political patronage cases in general, those cases did not involve statements made by the relevant hiring authority to the effect that a particular political affiliation was not an appropriate requirement for the particular position. Indeed, the precise issue raised in this appeal is one of first impression in this circuit. While the ever evolving formulations developed by the Supreme Court and this court are to be applied in cases which present no conflicting testimony from members of the hiring authority, we believe that a rigid application of such tests under the circumstances of this case would render the relevant analysis overly formalistic and not consonant with the principles and rationales underlying the development of the law in the area of political patronage.

Political patronage is a practice as old as the American Republic. See Rutan v. Republican Party, 497 U.S. 62, 95 (1990) (Scalia, J., dissenting) (commenting that political patronage "bears the endorsement of a long tradition of

open, widespread, and unchallenged use that dates back to the beginning of the Republic"). It has been argued by commentators that political patronage, while at times possessing a pejorative connotation, has been a basic and accepted element in the development of the American form

of democratic government, essential to maintain loyalty and strength in the political party system. See R. Hofstadter, The Idea of a Party System, 225–26 (1969). While political patronage has certainly been embedded in the fabric of the American political process, the case law concerning its limitations in the face of countervailing First Amendment rights is of more recent vintage.

In Elrod v. Burns, 427 U.S. 347 (1976), the Supreme Court, in a plurality opinion, held that the discharge of a government employee because of his political affiliation violates the freedom of association clause of the First Amendment. Id. at 373. The case arose from the election of a Democratic Sheriff of Cook County, Illinois who, upon taking office, terminated the employment of deputy sheriffs who were not members or who did not otherwise support the Democratic party. In finding that such a practice violated the First Amendment, the Supreme Court generally ended the practice of "cleaning house," whereby the prevailing political party would fire many employees who were members of the losing party, and give the vacant positions to loyal supporters as the spoils of victory.

The Elrod Court recognized that termination based solely on political affiliation, on its face, was at war with First Amendment principles. 427 U.S. at 359. The Court, however, did not completely do away with the practice, but recognized that political affiliation was relevant to the performance of the duties of certain positions. Id. at 367. The Court justified this exception by weighing the governmental benefit of considering political affiliation as a criterion in employment decisions against the encroachment on an employee's First Amendment right to political association. Id. A plurality of the Court distinguished between "policymaking" and "nonpolicymaking" positions in determining when political affiliation was relevant for employment decisions. Id. at 367–68. Those positions falling into the former category were held to be exempt from the general prohibition against terminating employees based on political affiliation. Id. at 372. Accordingly, a "nonpolicymaking, nonconfidential government employee" could not be discharged on the sole ground of his political beliefs. Id. at 375 (Stewart, J., concurring). The plurality acknowledged that

>[n]o clear line can be drawn between policymaking and nonpolicymaking positions. While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibilities is critical . . . . An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals.

Id. at 367-68.

The Court also made clear that the intermediate "exacting" level of scrutiny must be applied. Id. at 362. Thus, the "interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest." Id.

Three years later, the Supreme Court reformulated the Elrod test. In Branti v. Finkel, 445 U.S. 507 (1979), two county assistant public defenders brought a civil rights action alleging that their imminent termination by the newly appointed Democratic public defender was based solely on the fact that they were Republicans. The Court reiterated the general principle that if an employee's "private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." Id. at 517.

The Branti Court was clearly dissatisfied with the categorical approach enunciated in Elrod, which distinguished between "policymaking" and "nonpolicymaking" positions, and sought to clarify that test. 445 U.S. at 518. Accordingly, the Branti Court held that "the ultimate inquiry is not whether the label `policymaker' or `confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518.

In Ness v. Marshall, 660 F.2d 517 (3d Cir. 1981), Judge Gibbons, writing for this court in its first foray into the political patronage issue, proceeded to adopt a standard which further refined the Elrod/Branti test by using what the court termed a "functional analysis" approach. Under this test, should a difference in party affiliation be "highly likely to cause an official to be ineffective in carrying out" the duties of the position, then dismissal for that reason would not violate the First Amendment. Id. at 521. Applying that test to the city solicitors in the case, the court found that a lawyer's duties--e.g., rendering legal opinions, drafting ordinances, negotiating contracts--defined a position for which party affiliation was an appropriate requirement.

In Brown v. Trench, 787 F.2d 167, 168 (3d Cir. 1986), this court sought to further refine and clarify the Elrod/Branti test in this circuit by making clear that the "relevant inquiry is to the function of the public office in question and not the actual past duties of the particular employee involved." This court also noted that the

> fact that an employee is in a policymaking or confidential position is relevant to the question of whether political affiliation is a necessary job requirement but this fact is no longer dispositive after Branti.

Id. at 168-69. After reviewing a number of cases arising under Elrod and Branti in other jurisdictions, the Brown court concluded that the "key factor" seemed to be "not whether the employee was a supervisor or had a great deal of responsibility but whether the employee has `meaningful input into decisionmaking concerning the nature and scope of a major township program.' " 787 F.2d at 169-70 (quoting Nekolny v. Painter, 653 F.2d 1164, 1170 (7th Cir. 1981), cert. denied, 455 U.S. 1021 (1982)). Factors relevant in this inquiry include

> whether the employee's duties are simply . . . nondiscretionary or technical, . . . whether the employee participates in . . . discussions or other meetings, whether the employee prepares budgets or has authority to hire or fire employees, the salary of

15

> the employee, and the employee's power to control others and to speak in the name of policymakers.

Id. at 169 (citations omitted).

To a great degree, the evolution of political patronage law in the Third Circuit as embodied in the case law discussed above, set the stage for this court's watershed opinion in Zold v. Township of Mantua, 935 F.2d 633 (3d Cir. 1991). Zold's significance lies in its synthesis of prior decisions up to that point and articulation of the intermediate level of scrutiny in political patronage cases, consistent with the principle first enunciated in Elrod by Justice Brennan. See Elrod, 427 U.S. at 362. In Zold, this court acknowledged that "[i]t is not always easy to determine whether affiliation is a legitimate factor to be considered for a particular job," and that each decision is "fact specific for that case." 935 F.2d at 635. The court found, however, that although a "nonpolicymaking, nonconfidential government employee cannot be discharged on the sole ground of his or her political beliefs," he or she can be dismissed on that ground if he or she "acts as an advisor or formulates plans for the implementation of broad goals." Id. at 635. Of course, as stated in Branti, the ultimate inquiry is not whether a position can be termed policymaking or confidential, but whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.3 Id.

The Zold decision is significant for its explicit adoption of the special scrutiny standard. But as with Elrod and Branti, and their progeny, the adoption of the special scrutiny

_____

3. Significantly, this court held that because the case implicated the First
Amendment, it would "make an independent examination of the whole record." Zold, 935 F.2d at 636. Relying on New York Times v. Sullivan, 376 U.S. 254 (1964), the court concluded that when an issue on appeal turns on a "constitutional fact"--those whose determination is decisive of a constitutional issue--appellate courts are obligated to review such facts with "special scrutiny." Zold, 935 F.2d at 636. Moreover, an appellate court "may draw its own inference from facts in the record." Id.

We have accordingly undertaken an independent examination of the record developed in the district court and have drawn our own inferences from those facts.

16

standard does not in and of itself provide a great deal of guidance in the practical application of that test, and thus, Zold reaffirms the limitations inherent in attempting to establish factors to be used by courts in analyzing political patronage claims.

The lack of explicit guidance from the Supreme Court

and this court thus far, however, results in a greater flexibility on the part of lower courts to determine each case under its own facts and in its own context. Thisflexibility may serve the dual goals of the Elrod/Branti exception: to permit governmental entities to use political affiliation where the governmental interest is "overriding" and of "vital importance," while concomitantly protecting the individual's right to freedom of association guaranteed by the First Amendment. Elrod, 427 U.S. at 362, 368; Branti, 445 U.S. at 515-16.

To this end, Elrod, Branti and their progeny have established certain principles of law which constitute the general parameters by which the analysis must be guided. These cases require courts to focus on various factors, including whether an employee is a "nonpolicymaking, nonconfidential government employee," Elrod, 427 U.S. at 375 (Stewart, J., concurring), whether a difference in party affiliation would be "highly likely to cause an official to be ineffective in carrying out" the duties of the position, Ness, 660 F.2d at 521, whether "the employee has meaningful input into decision making concerning the nature and scope of a major . . . program," Brown, 787 F.2d at 169-70, or whether the employee "acts as an advisor or formulates plans for the implementation of broad goals," Zold, 935 F.2d at 635; Peters, 16 F.3d at 1354.

The "burden of proof is on the defendant to demonstrate `an overriding interest' in order to validate an encroachment on an employee's First Amendment rights." Zold, 935 F.2d at 635 (quoting Elrod, 426 U.S. at 368); see also Rosenthal v. Rizzo, 555 F.2d 390, 394 n.5 (3d Cir.), cert. denied, 434 U.S. 894 (1977). This burden is "substantial." Burns v. County of Cambria, 971 F.2d 1015, 1022 (3d Cir. 1992), cert. denied, 506 U.S. 1081 (1993). Moreover, the court must apply the intermediate "exacting" level of scrutiny. Elrod, 427 U.S. at 362; Zold, 935 F.2d at 636.

17

In general, courts are also advised to look to the "function[s] of the office in question and not the actual past duties of the particular employee involved." Peters, 16 F.3d at 1353; Brown, 787 F.2d at 168; O'Connor v. Steeves, 994 F.2d 905, 911 (1st Cir.) ("[T]he actual past duties of the discharged employee are irrelevant if the position inherently encompasses more expansive powers and more important functions that would tend to make political affiliation an appropriate requirement for effective performance."), cert. denied, 510 U.S. 1024 (1993). Although actual past duties are not determinative, they may be informative. Waskovich v. Morgano, 2 F.3d 1292, 1300 (3d Cir. 1993).

The question of whether an employee falls within the Elrod/Branti exception is generally one of fact. Furlong v. Gudknecht, 808 F.2d 233, 235 (3d Cir. 1986); Rosenthal, 555 F.2d at 393 n.5. However, summary judgment may be appropriate in certain circumstances. Ness, 660 F.2d at 521.

The above described principles are certainly applicable to ordinary political patronage cases. However, the existence of the deposition testimonies in this case takes this case, we believe, out of the ordinary realm. The case law developed in this area has generally not involved a similar situation where a hiring authority specifically testifies that political affiliation is not an appropriate requirement for a particular position. In resolving this issue, then, it is important to keep in mind that the touchstone of political patronage analysis is that the "hiring authority [must] demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Branti, 445 U.S. at 518 (emphasis supplied).

Under the Pennsylvania Constitution, the "corporate power of the county [is] vested in a board of county commissioners." 16 Pa.Cons.Stat.Ann. S 3203. Accordingly, Boyle argues, and appellees do not dispute, that a majority of the Board of County Commissioners are the only officials vested with the authority to appoint or dismiss Boyle. When a majority of the Board--and thus, a majority of the "hiring authority"--testifies that political affiliation is not an appropriate requirement for the position of Deputy Director,

18

it is difficult to see how this fact can be considered "merely colorable or not significantly probative."4

In support of the district court's decision, the appellees rely on Waskovich v. Morgano, 2 F.3d 1292 (3d Cir. 1993). In that case, plaintiff, a Republican, alleged that he was terminated from his position as Director of Veterans' Administrative Services for the State of New Jersey on the basis of his political affiliation after Governor Florio took office. The district court granted summary judgment in favor of the defendants, finding that the plaintiff occupied a confidential, policymaking position from which he could be dismissed on the basis of political affiliation. Waskovich v. Morgano, 800 F. Supp. 1220 (D.N.J. 1992). On appeal, this court affirmed.

The plaintiff argued on appeal that summary judgment

was inappropriate because two government officials had testified that political affiliation was not a proper requirement for the position of Director of Veterans' Administrative Services. The Deputy Adjutant General had testified that "party affiliation is not a qualification for the job of [D]irector of veterans' Administrative Services." Waskovich, 2 F.3d at 1301. In addition, the Deputy Commissioner testified that political affiliation did not play a part in whether the Director retains his job. Id.

This court held that these deposition testimonies did not create a genuine issue of material fact based on the absence of such testimony favorable to the plaintiff by the Adjutant General himself, "the only official who is vested with the statutory authority to appoint or dismiss the Director." Id. at 1302. The question, this court reasoned, must focus on whether the Adjutant General, as the hiring

_____

4. Moreover, although the district court disposed of the significance of the testimonies in conclusory fashion, the language employed by the court reveals that it may have crossed the threshold into inappropriate weighing of the evidence. The district court found the testimonies to be insignificant "[i]n light of the undisputed evidence regarding plaintiff's authorized and actual duties as Deputy Director . . . ." The court did not merely note the existence of contradictory evidence, but rather, measured the weight of the deposition testimonies with what it regarded as overwhelming evidence on the other side.

19

authority, had a valid basis to prefer an individual of one political party over another.5Id.

_____

5. The Waskovich court also noted that the two government officials had also testified to the importance of the Director's sharing the same general philosophy as his superiors. 2 F.3d at 1301–02. One government official had testified that "[i]t is extremely important that . . . we are all in concurrence in regard to the philosophy that the Department has adopted, to [e]nsure that the policy has been carried out." The other official testified stressed the importance of the Director and his superiors sharing the same "philosophical judgment."

Appellees in this case point to what they describe as similar favorable testimony by Cranmer:

> Q: Third: "Coordinating the airport public information program." Is there a rational connection between party affiliation and doing

that, those duties?

A: Well, again, there is not. Now certainly, there is a relationship
between -- Certainly want people working for you that share the
same goals and objectives and the manner in which you are
going to arrive at those objectives in those positions. Whether
they be Democrats or Republicans is irrelevant, but certainly,
the previous administration and majority of the people that
worked for the previous administration, there was a different
ideology, there was a different mind set. They had different
objectives, so to say if someone is a Democrat or Republican at
face value, that those two labels mean anything isn't the case,
but certainly, what they believe does.

* * *

Q: Is it a legitimate consideration for placement or retention the
fact that someone voted Democrat or Republican or voted for
you?

A: I am saying in some cases, it could be; in some cases, it
wouldn't be. It all depends on that individual.

Q: So it's an individual decision, is that what you are saying?

A: It's still based upon that person and what they believe and what
they stand for; and because of that, they vote one way or they
vote the other. Generally, there probably could be a line that
could be drawn down party-by-party affiliation, but that doesn't
always hold true.

This testimony is notable for its utter vagueness and ambiguity. It seems
that the only clear statement made by Cranmer is that there is no

Waskovich is readily distinguishable. In the case at bar,
Cranmer and Dawida were not merely government officials
who lacked hiring authority. Rather, they were two out of
three Commissioners who had the actual authority to
appoint or dismiss Boyle. Indeed, their testimonies relate
directly to whether the "hiring authority" had a valid basis
to prefer an individual of one political party over another.

Case law in this circuit and elsewhere6  supports the
conclusion that statements by a hiring authority to the
effect that political affiliation is not a proper requirement
for a particular governmental position are indeed
significant. In Rosenthal v. Rizzo, 555 F.2d 390 (3d Cir.),
cert. denied, 434 U.S. 894 (1977), for example, plaintiff had
been appointed to a position as an Administrative Assistant

II in a department of the Redevelopment Authority of Philadelphia. When a new Executive Director took office, plaintiff was terminated. Plaintiff filed suit alleging that, inter alia, he was terminated for his political affiliation in violation of his First Amendment rights. Id. at 391-92.

Evidence adduced through discovery was conflicting. On the one hand, deposition testimony revealed that plaintiff was merely a "soldier;" that he only oversaw bidding practices to uncover corruption and to ensure that policies implemented by others were carried out; that he had no power to decide which bids for relocation work would be accepted; and that he only worked for the actual policymaker in the department. Id. at 392. At one point, the Executive Director himself testified that the plaintiff's primary duty was to act as a spy for the former Director of the Authority. Id. On the other hand, evidence also showed

_____

rational connection between party affiliation and performing the duty of "Coordinating the airport public information program." At best, Cranmer testified that similar ideology, in general, is desirable, but he makes no reference to Boyle's duties in this context. Such vague statements cannot measure against the rather clear statements at issue in Waskovich.

6. See, e.g., Burchett v. Cheek, 637 F. Supp. 1249, 1251 (W.D. Va. 1985) (ordering reinstatement of assistant registrar of county based, inter alia,
on trial testimony of general registrar that political affiliation was irrelevant to position), aff'd, 829 F.2d 1319 (4th Cir. 1987), cert. denied,
486 U.S. 1006 (1988).

that the plaintiff helped rewrite the "relocation code"; that he was a "top line" employee; and that he oversaw work and reviewed bids. Id. In reversing the district court's grant of summary judgment, the court stated that

> the determination of status as a policymaker vel non presents a difficult factual question. Where there is evidence to support the employee's claim that he does not make policy, as there is here, he is entitled to a full trial on the issue. Indeed, the state bears the burden of persuasion on that question at trial. Certainly, then, it was improper for the district court to weigh the evidence and rule against [plaintiff] on this issue on a Rule 56 motion.

Id. at 394 n.5.

This court went on to find that "two of the defendants admitted [plaintiff's] status as a non-policymaker, while as to the other two defendants, [plaintiff 's] status represented a genuine issue of material fact." Id. This court held that the district court erred in granting summary judgment to defendants on these facts, finding that the lower court had improperly engaged in weighing the evidence. Id. at 392-93.

In Furlong v. Gudknecht, 808 F.2d 233, 235 (3d Cir. 1986), the plaintiff, a Second Deputy to the Recorder of Deeds and a Democrat, brought an action in the Eastern District of Pennsylvania to preliminarily enjoin the newly elected Republican Recorder of Deeds from terminating her position. The district court granted the plaintiff's motion for a temporary restraining order and a preliminary injunction based, in part, upon the following testimony of the defendant Recorder of Deeds:

> [Q.] Mr. Gudknecht, is political party affiliation of the first or second deputy important with respect to the performance of their official duties?
>
> [A.] No, it's not.

Id. The defendant, in later testimony, attempted to change his answer, but the district court, while allowing it into

22

evidence, discredited the later testimony. Id. This court affirmed.7

The notion that statements made by members of a hiring authority--to the effect that political affiliation is not a proper consideration in hiring or firing--constitute probative evidence is consonant with the rationale and policy underlying the Elrod/Branti exception. We do not dispute that political patronage has traditionally played an important role in the political process, and as has been vigorously argued by various judges and legal commentators, political patronage has proven to be a necessary and beneficial practice. As a practical matter, however, political patronage provides benefits which inure primarily to the elected officials invoking the privilege. Indeed, as Justice Brennan writing for the plurality in Elrod persuasively argued, the benefits derived from political patronage should not be overstated.8 As noted by the Court

_____

7. It should be noted that Furlong dealt specifically with the issue of whether the possibility of an employee's statutory ascension to a

superior's elected office in itself is sufficient to qualify the employee's
position for an Elrod/Branti exception. Accordingly, this case is not directly on point with the facts of the case at bar. However, it is instructive to note how both the district court and this court addressed the admission by the Recorder of Deeds that political affiliation was not important with respect to the position of second deputy. In contrast to the district court in this case, both courts found that particular evidence
extremely probative.

8. In his opinion, Justice Brennan identified three separate governmental interests arguably served by political patronage dismissals: (1) the interest in effective and efficient government; (2) the need for loyal employees to implement the programs of a democratically elected administration; and (3) the preservation of strong and broad-based political parties. Elrod, 427 U.S. at 364-68.

With regard to the first identified interest, Justice Brennan noted that rather than promoting efficiency, "the wholesale replacement of large numbers of public employees every time political office changes hands belies this justification." Id. at 364. Moreover, it is not clear at all, Justice Brennan continued, that political patronage dismissal will result in replacement by a person "more qualified to do the job since appointment often occurs in exchange for the delivery of votes, or other party service, not job capability." Id. at 364-65. Justice Brennan

23

in O'Hare Truck Service, Inc. v. City of Northlake, ___ U.S. ___, 116 S.Ct. 2353, 2361 (1996), the "absolute right to enforce a patronage scheme . . . has not been shown to be a necessary part of a legitimate political system in all instances." Thus, while the general public certainly derives benefits from political patronage--insofar as strong political parties are an important aspect of the American democratic process--these benefits are, at best, indirect.9 As Justice
_____

concluded by commenting that "[m]ore fundamentally, . . . the argument does not succeed because it is doubtful that the mere difference of political persuasion motivates poor performance; nor do we think it legitimately may be used as a basis for imputing such behavior." Id. at 365.

In response to the loyalty argument, Justice Brennan acknowledged that it possessed some force, but was ultimately unavailing. The government's interest in loyalty can be adequately protected by "[l]imiting
patronage dismissals to policymaking positions . . .." Id. at 367.

With regard to the third justification for political patronage, Justice

Brennan first acknowledged that the preservation of the democratic process was an interest the protection of which may in certain circumstances justify limitations on First Amendment rights. Id. at 368.

> But however important preservation of the two-party system or any system involving a fixed number of parties may or may not be, . . . we are not persuaded that the elimination of patronage practice or, as is specifically involved here, the interdiction of patronage dismissals, will bring about the demise of party politics. Political parties existed in the absence of active patronage practice prior to the administration of Andrew Jackson, and they have survived substantial reduction in their patronage power through the establishment of merit systems.

Id. at 369 (citations omitted).

9. As intimated previously, this court recognizes that this somewhat narrow view of political patronage as fundamental to the democratic process, as espoused by Justice Brennan, is not universally accepted. In his dissent in Branti, Justice Powell admonished that "[p]atronage appointments help build stable political parties by offering rewards to persons who assume the tasks necessary to the continued functioning of political organizations." 445 U.S. at 528. Justice Powell emphasized the historic role of political patronage in democratizing the political process, stimulating political activity over a wider pool of the American population

Brennan cogently noted, "[p]artisan politics bears the imprimatur only of tradition, not the Constitution." Elrod, 427 U.S. at 369 n.22.

Moreover, whatever benefits the "tradition" of political patronage may provide surely is counterbalanced by the resulting limitation on First Amendment freedoms. In Elrod, Justice Brennan noted that "[p]atronage . . . to the extent it compels or restrains belief and association is inimical to the process which undergirds our system of government and is `at war with the deeper traditions of democracy

_____

and contributing to the maintenance of strong and accountable political parties. Elrod, 427 U.S. 377-79 (Powell, J., dissenting); Branti, 445 U.S. 522 n.1 (Powell, J., dissenting). These themes are shared with equal conviction by Justice Scalia who, in a dissenting opinion in Rutan, concluded that "[s]uch a venerable and accepted tradition [as political patronage] is not to be laid on the examining table and scrutinized for its

conformity to some abstract principle of First Amendment adjudication devised by this Court. To the contrary, such traditions are themselves the stuff out of which the Court's principles is to be formed." 497 U.S. 95-96 (Scalia, J., dissenting).

Similarly, former Chief Judge Ruggero J. Aldisert has been extremely critical of the Elrod/Branti decisions, noting that his only reason for following them was his strong loyalty to stare decisis. Loughney v. Hickey, 635 F.2d 1063, 1065 (3d Cir. 1980) (Aldisert, J., concurring) (characterizing his disagreement with Elrod and Branti as "vehement disagreement"). In Judge Aldisert's view, Elrod and Branti

>reflect the apogee of a process that seeks to "constitutionalize" the entire fabric of American society. This process transmutes the United States Constitution from a broad statement of moral values into a detailed code of conduct, ignoring Chief Justice Marshall's admonition that "we must never forget, that it is a constitution we are expounding."

Id. (quoting McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 407 (1819)). Judge Aldisert is not the only member of this court to hold a critical view of the limitations imposed on the practice of political patronage by the Elrod/Branti line of decisions. See,e.g., Carver v. Foerster, 102 F.3d 96, 105-10 (3d Cir. 1996) (Becker, J., concurring).

We believe, however, that such views--which essentially raise the "tradition" of political patronage above the fundamental rights provided in the First Amendment--remain in the minority.

25

embodied in the First Amendment.' " 427 U.S. at 357 (quoting Illinois State Employees Union v. Lewis , 473 F.2d 561, 576 (7th Cir. 1972), cert. denied, 410 U.S. 928 (1973)). "Thus, if patronage contributes at all to the elective process, that contribution is diminished by the practice's impairment of the same." Id. at 369. And whatever "the gain to representative government provided by the practice of patronage, if any, would be insufficient to justify its sacrifice of First Amendment rights."10 Id.

That whatever benefits derived from political patronage are "diminished by the practice's impairment of " fundamental First Amendment principles is manifested in the very structure of political patronage analysis mandated under Elrod, Branti and their progeny. For instance, the burden, characterized as a substantial one, is placed squarely upon defendants to prove that political affiliation is an appropriate requirement for a particular position. Moreover, courts must apply the intermediate "exacting"

level of scrutiny in such cases.

Accordingly, political patronage is a practice which primarily benefits those political entities that invoke the privilege. When those political entities themselves testify that political affiliation is or should not be an important consideration, as in this case, such evidence, at the very least, creates a genuine issue of material fact precluding summary judgment. Put another way, if the hiring authority is obligated to demonstrate that political affiliation is an appropriate requirement for a particular position, then we cannot see how its own statements relating directly on the issue can be considered anything less than probative. The appellees' argument, to the effect that the testimonies of the two Commissioners should be ignored and the court should rely solely on the inherent functions of the position in question, exalts form over

_____

10. That the Supreme Court's expansive view of First Amendment rights in the context of political patronage cases remains intact is exemplified by its decision last year in O'Hare Truck Service, in which the Court extended the protections of Elrod and Branti to independent contractors. O'Hare Truck Service thus overruled this court's prior decision in Horn v. Kean, 796 F.2d 668 (3d Cir. 1986) (en banc).

26

substance in the context of this case, rendering the analysis called for under Elrod, Branti and their progeny overly formalistic. The significant encroachment upon First Amendment rights by the practice of political patronage does not justify such an approach.

III. Conclusion

For the foregoing reasons, the district court's order granting defendants' motion for summary judgment is reversed, and this matter will be remanded to the district court for further proceedings.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

27