

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-10-2009

# MBIA Ins Corp v. Royal Indemnity Co

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-4338

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

### Recommended Citation

"MBIA Ins Corp v. Royal Indemnity Co" (2009). *2009 Decisions.* Paper 1555.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1555

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 07-4338
_____

MBIA INSURANCE CORPORATION; WELLS FARGO
BANK, N.A., as TRUSTEE of CERTAIN SFC
GRANTOR and OWNER TRUSTS

v.

ROYAL INDEMNITY COMPANY,

Appellant

On Appeal From the United States District Court
for the District of Delaware
(02-cv-01294)
District Judge:  Honorable Joseph J. Farnan, Jr.

Argued March 10, 2009

Before: FUENTES, CHAGARES, and ALDISERT, <u>Circuit Judges</u>

Filed: April 10, 2009

Michael H. Barr (argued)
Sonnenschein, Nath & Rosenthal
1221 Avenue of the Americas, 24th Fl.
New York, NY 10020

Kenneth J. Pfaehler
Sonnenschein, Nath & Rosenthal
1301 K St., N.W.
Ste. 600, East Tower
Washington, DC 20005

Counsel for Appellant

Andre G. Castaybert
Guzov Ofsink
600 Madison Ave., 14th Fl.
New York, NY 10022

Dawn M. Jones
Melanie K. Sharp
John W. Shaw
Young, Conaway, Stargatt & Taylor
1000 West St., P.O. Box 391
Brandywine Bldg., 17th Fl.
Wilmington, DE 19899

Steven E. Obus (argued)
Ronald S. Rauchberg
Proskauer Rose
1585 Broadway
New York, NY 10036
Counsel for Appellees

_____

OPINION OF THE COURT
_____

CHAGARES, Circuit Judge.

Royal Indemnity Company (Royal) appeals from the District Court's grant of summary judgment to Wells Fargo Bank, N.A. (Wells Fargo) on Royal's breach of contract claim. We will affirm.

I.

Student Finance Corporation (SFC) borrowed money from banks to make loans to

2

vocational school students. SFC insured those loans through Royal. That is, Royal would pay the banks if the students defaulted. SFC then "securitized" the loans. It created a series of trusts, named Wells Fargo trustee, and then conveyed the loans to the trusts. The trusts sold shares of their loan portfolio via notes called "certificates." SFC arranged for Royal to insure the trust corpus, and SFC named Wells Fargo as the beneficiary. If any students defaulted, Royal would make sure Wells Fargo had enough resources to pay any certificateholders looking to cash out.

SFC used Student Loan Servicing (SLS) to service the loans. SLS opened a lockbox account for the trusts and instructed student debtors to deposit payments into that account. It collected those payments and transmitted them to Wells Fargo. SLS also produced four computer files: (1) a monthly spreadsheet, called the "Delinquency Aging Report," listing each delinquent loan, the name of the debtor, how much principal is owed, and the date by which that balance must be paid, see, e.g., Appendix (App.) 2087-2208; (2) another monthly spreadsheet, called the "Default Schedule," listing each defaulted loan, the name of the debtor, how much principal is owed, and how much interest is owed, see, e.g., App. 2086; (3) a monthly database listing each loan, the debtor's contact information, the principal and interest owed, the principal and interest already paid, and dates and amounts of principal and interest payments made that month, see, e.g., App. 2217-80; and (4) a weekly database listing similar information, but only as to loans with activity during that week, see, e.g., App. 1984-2085. SLS sent the first two

3

files to Wells Fargo Corporate Trust, a Wells Fargo affiliate in Minneapolis. It sent the second two files to back-up servicers – entities that could have taken over SLS's duties should Royal have elected to replace SLS at any time during the life of the contract. The first back-up servicer was FINOVA in Salt Lake City, and the second was Wells Fargo Financial, a Wells Fargo affiliate in Des Moines. SLS also produced a monthly "Servicer Report" that contained aggregate balance information for all current, delinquent, and defaulted loans. See, e.g., App. 3327-29.

Royal received the Servicer Report but not the computer files, and it was not content to take that report on faith. It wanted some assurance that the numbers in the report were not simply plucked from thin air. Wells Fargo agreed to vet the Servicer Report numbers, but only to a limited extent. Wells Fargo would not look behind the data provided by SLS. See, e.g., App. 817 ("Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any . . . statement, . . . report, . . . or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties") (§ 8.4(a)), ("Trustee shall not be required to make any . . . examination of any documents or records related to the Student Loans for the purpose of establishing the presence or absence of defects . . .") (§ 8.4(g)). It would instead check portions of the Servicer Report against certain computer files and bring inconsistencies to Royal's attention. Specifically, § 8.19 of the securitization contract obligated Wells Fargo to

4

(a) in accordance with Section 3.8(b) hereof, not later than 12:00 noon Minneapolis time on the second Business Day preceding each Servicer Report Date, accept delivery of the Tape[1] used to calculate the information contained in the Servicer Report and shall accept delivery from the Servicer of a hard copy of the Servicer Report;

(b) compare the information received on Tape from the Servicer to the same received on the Servicer Report with respect to delinquencies, ratios and the aggregate principal balance of the Student Loans; [and]

. . . .

(d) inform the Insurer [Royal], MBIA, the Servicer, and the Certificateholders as to any discrepancy on such Servicer Report . . . .

App. 826 (footnote added).

And § 8.21(d) provided that Wells Fargo

. . . shall receive an electronic transmission of all servicing and/or Student Loan File information (including all relevant Obligor contact information, such as address and telephone numbers, as well as Student Loan principal balance and payment information, including any comment histories and collection notes) and shall review such Student Loan File information to ensure that it is in readable form and verify that the data balances conform to the trial balance reports received from the Servicer. In addition, the Trustee shall store such Student Loan File information and verify certain information contained in each Servicer Report.

---

[1] Section 1.1 explains that "unless the context otherwise requires . . . 'Tape' has the meaning set forth in section 3.8(b) . . . ." App. 757, 772. Section 3.8(b) in turn provides

The Servicer shall deliver to the Trustee on or prior to 12:00 noon Salt Lake City time on each Weekly Report Date and on each Servicer Report Date an updated of the computer tape, diskette or other computer readable medium, in a format acceptable to the Trustee which provides information as to the Student Loans reflecting the information set forth thereon as of the preceding Servicer Report Date (the "tape") . . . .

App. 787.

5

The Trustee shall receive the data referenced in this paragraph on a weekly basis . . . .[2]

App. 828 (footnote added). Section 8.20, however, expressly disclaimed trustee liability in connection with review conducted pursuant to § 8.21:

> The Trustee . . . shall monitor the performance of the Servicer on behalf of the Certificateholders as set forth in Section 8.21 hereof; provided, however, that the Trustee shall not have any liability in connection with the malfeasance or nonfeasance by the Servicer or for monitoring the Servicer . . . .

App. 827.

As it turned out, the loans were not performing as well as SFC had hoped. Students were missing payments in large numbers, making insuring the loans an increasingly risky proposition for Royal. So, SFC used its own funds to make up the shortfalls. These "forbearance payments," as SFC internally called them, gave the impression that the loans were performing up to par and therefore that insuring them was a reasonable risk. SFC executed seven more securitizations, creating a total of eight trusts. SFC continued to make payments, and Royal continued to insure new trusts.

---

[2] Royal was not a party to the securitization contract and was not mentioned in § 8.21. Section 11.9 of the contract expressly addressed who may and may not be a third-party beneficiary:

> Except as otherwise specifically provided herein with respect to the Certificateholders, the parties to this Agreement hereby manifest their intent that no third party other than each Certificateholder, the Insurer [Royal] and MBIA shall be deemed a third party beneficiary of this Agreement . . . .

App. 835.

6

Wells Fargo never discovered this problem during the course of its data reviews. It compared loan-specific data given in the Delinquency Aging Report with the aggregate data given in the Servicer Report and found no discrepancies. See App. 2727-38, 5832-35. It also examined the monthly and weekly databases to make sure they were computer-readable and contained the right categories of information in the event Wells Fargo had to step in for SLS and contact student debtors, and found no problems.

Eventually, SFC's forbearance payment procedure crumbled, exposing Royal to hundreds of millions of dollars worth of liability on certificates that SFC no longer had the resources to cover. Royal sued Wells Fargo, arguing that Wells Fargo breached the securitization contract[3] when it failed to detect the forbearance payments and bring them to Royal's attention. Royal did not identify any numerical inconsistencies among the various files and documents. Nevertheless, it contended that the data comparison called by §§ 8.19 and 8.21, if properly performed, would have revealed SFC's plot — and therefore would have caused Royal to stop insuring new trusts — because the forbearance payments stood out very clearly on the computer files Wells Fargo received, namely: (1) the last week of each month saw a huge increase in total interest paid compared to earlier weeks, but total principal paid remained relatively steady; (2) more than half of the payments made during the entire month were made on a single day of that week; (3) nearly all of those payments were interest-only, whereas regular payments contained a

---

[3] Each securitization contract was materially identical.

principal component as well; and (4) nearly all of those payments were coded as type "12," whereas regular payments were coded as type "10."

Wells Fargo moved for summary judgment, and the District Court granted the motion. Royal then filed this appeal.

## II.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1332(a), and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

This Court reviews the District Court's grant of summary judgment de novo, using the same test that the District Court was obligated to apply. In re Ikon Office Solutions, Inc., 277 F.3d 658, 665 (3d Cir. 2002). Summary judgment should be awarded when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party [here, Wells Fargo] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). All reasonable inferences from the record must be drawn in favor of the nonmoving party, here Royal. Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 666 (3d Cir. 1995). This Court may not weigh the evidence or assess credibility. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).

## III.

We have reviewed the parties' briefs and heard oral argument on the issues presented. We believe that the District Court's analysis very ably identified the nub of the

8

controversy. Royal argues that Wells Fargo had the contractual obligation to analyze data using certain financial accounting principles and to detect any anomalies that analysis might have uncovered. As Royal suggests, this analysis may not have been very labor-intensive. Yet, the contract did not call for any analysis at all. It simply required Wells Fargo to perform rote comparisons between that data and data contained in various other sources, and to report any numerical inconsistencies. Wells Fargo did just that.

Therefore, applying the above standard of review, we will affirm the District Court's judgment in all respects, essentially for the reasons set forth in its well-reasoned, comprehensive opinion.